(Slip Opinion) OCTOBER TERM, 2015 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FOSTER *v.* CHATMAN, WARDEN

### CERTIORARI TO THE SUPREME COURT OF GEORGIA

No. 14–8349.   Argued November 2, 2015—Decided May 23, 2016

Petitioner Timothy Foster was convicted of capital murder and sentenced to death in a Georgia court. During jury selection at his trial, the State used peremptory challenges to strike all four black prospective jurors qualified to serve on the jury. Foster argued that the State's use of those strikes was racially motivated, in violation of *Batson* v. *Kentucky*, 476 U. S. 79. The trial court rejected that claim, and the Georgia Supreme Court affirmed. Foster then renewed his *Batson* claim in a state habeas proceeding. While that proceeding was pending, Foster, through the Georgia Open Records Act, obtained from the State copies of the file used by the prosecution during his trial. Among other documents, the file contained (1) copies of the jury venire list on which the names of each black prospective juror were highlighted in bright green, with a legend indicating that the highlighting "represents Blacks"; (2) a draft affidavit from an investigator comparing black prospective jurors and concluding, "If it comes down to having to pick one of the black jurors, [this one] might be okay"; (3) notes identifying black prospective jurors as "B#1," "B#2," and "B#3"; (4) notes with "N" (for "no") appearing next to the names of all black prospective jurors; (5) a list titled "[D]efinite NO's" containing six names, including the names of all of the qualified black prospective jurors; (6) a document with notes on the Church of Christ that was annotated "<u>NO</u>. No <u>Black</u> Church"; and (7) the questionnaires filled out by five prospective black jurors, on which each juror's response indicating his or her race had been circled.

   The state habeas court denied relief. It noted that Foster's *Batson* claim had been adjudicated on direct appeal. Because Foster's renewed *Batson* claim "fail[ed] to demonstrate purposeful discrimination," the court concluded that he had failed to show "any change in the facts sufficient to overcome" the state law doctrine of res judicata.

Syllabus

The Georgia Supreme Court denied Foster the Certificate of Probable Cause necessary to file an appeal.

*Held*:

   1. This Court has jurisdiction to review the judgment of the Georgia Supreme Court denying Foster a Certificate of Probable Cause on his *Batson* claim. Although this Court cannot ascertain the grounds for that unelaborated judgment, there is no indication that it rested on a state law ground that is both "independent of the merits" of Foster's *Batson* claim and an "adequate basis" for that decision, so as to preclude jurisdiction. *Harris* v. *Reed*, 489 U. S. 255, 260. The state habeas court held that the state law doctrine of res judicata barred Foster's claim only by examining the entire record and determining that Foster had not alleged a change in facts sufficient to overcome the bar. Based on this lengthy "*Batson* analysis," the state habeas court concluded that Foster's renewed *Batson* claim was "without merit." Because the state court's application of res judicata thus "depend[ed] on a federal constitutional ruling, [that] prong of the court's holding is not independent of federal law, and [this Court's] jurisdiction is not precluded." *Ake* v. *Oklahoma*, 470 U. S. 68, 75; see also *Three Affiliated Tribes of Fort Berthold Reservation* v. *Wold Engineering, P. C.*, 467 U. S. 138, 152. Pp. 6–9.

   2. The decision that Foster failed to show purposeful discrimination was clearly erroneous. Pp. 9–25.

   (a) *Batson* provides a three-step process for adjudicating claims such as Foster's. "First, a defendant must make a prima facie showing that a preemptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination." *Snyder* v. *Louisiana*, 552 U. S. 472, 477 (internal quotation marks and brackets omitted). Only *Batson*'s third step is at issue here. That step turns on factual findings made by the lower courts, and this Court will defer to those findings unless they are clearly erroneous. See *ibid.* Pp. 9–10.

   (b) Foster established purposeful discrimination in the State's strikes of two black prospective jurors: Marilyn Garrett and Eddie Hood. Though the trial court accepted the prosecution's justifications for both strikes, the record belies much of the prosecution's reasoning. Pp. 10–22.

      (i) The prosecution explained to the trial court that it made a last-minute decision to strike Garrett only after another juror, Shirley Powell, was excused for cause on the morning that the strikes were exercised. That explanation is flatly contradicted by evidence

showing that Garrett's name appeared on the prosecution's list of "[D]efinite NO's"—the six prospective jurors whom the prosecution was intent on striking from the outset. The record also refutes several of the reasons the prosecution gave for striking Garrett instead of Arlene Blackmon, a white prospective juror. For example, while the State told the trial court that it struck Garrett because the defense did not ask her for her thoughts about such pertinent trial issues as insanity, alcohol, or pre-trial publicity, the record reveals that the defense asked Garrett multiple questions on each topic. And though the State gave other facially reasonable justifications for striking Garrett, those are difficult to credit because of the State's willingness to accept white jurors with the same characteristics. For example, the prosecution claims that it struck Garrett because she was divorced and, at age 34, too young, but three out of four divorced white prospective jurors and eight white prospective jurors under age 36 were allowed to serve. Pp. 11–17.

(ii) With regard to prospective juror Hood, the record similarly undermines the justifications proffered by the State to the trial court for the strike. For example, the prosecution alleged in response to Foster's pretrial *Batson* challenge that its only concern with Hood was the fact that his son was the same age as the defendant. But then, at a subsequent hearing, the State told the court that its chief concern was with Hood's membership in the Church of Christ. In the end, neither of those reasons for striking Hood withstands scrutiny. As to the age of Hood's son, the prosecution allowed white prospective jurors with sons of similar age to serve, including one who, in contrast to Hood, equivocated when asked whether Foster's age would be a factor at sentencing. And as to Hood's religion, the prosecution erroneously claimed that three white Church of Christ members were excused for cause because of their opposition to the death penalty, when in fact the record shows that those jurors were excused for reasons unrelated to their views on the death penalty. Moreover, a document acquired from the State's file contains a handwritten note stating, "<u>NO</u>. NO <u>Black</u> Church," while asserting that the Church of Christ does not take a stand on the death penalty. Other justifications for striking Hood fail to withstand scrutiny because no concerns were expressed with regard to similar white prospective jurors. Pp. 17–23.

(c) Evidence that a prosecutor's reasons for striking a black prospective juror apply equally to an otherwise similar nonblack prospective juror who is allowed to serve tends to suggest purposeful discrimination. *Miller-El* v. *Dretke*, 545 U. S. 231, 241. Such evidence is compelling with respect to Garrett and Hood and, along with the prosecution's shifting explanations, misrepresentations of the record,

and persistent focus on race, leads to the conclusion that the striking of those prospective jurors was "motivated in substantial part by discriminatory intent." *Snyder*, 552 U. S., at 485. P. 23.

(d) Because *Batson* was decided only months before Foster's trial, the State asserts that the focus on black prospective jurors in the prosecution's file was an effort to develop and maintain a detailed account should the prosecution need a defense against any suggestion that its reasons were pretextual. That argument, having never before been raised in the 30 years since Foster's trial, "reeks of afterthought." *Miller-El*, 545 U. S., at 246. And the focus on race in the prosecution's file plainly demonstrates a concerted effort to keep black prospective jurors off the jury. Pp. 23–25.

Reversed and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which KENNEDY, GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. ALITO, J., filed an opinion concurring in the judgment. THOMAS, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports.  Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 14–8349

TIMOTHY TYRONE FOSTER, PETITIONER *v.* BRUCE
CHATMAN, WARDEN

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
GEORGIA

[May 23, 2016]

CHIEF JUSTICE ROBERTS delivered the opinion of the
Court.

Petitioner Timothy Foster was convicted of capital
murder and sentenced to death in a Georgia court.  During
jury selection at his trial, the State exercised peremptory
strikes against all four black prospective jurors qualified
to serve.  Foster argued that the State's use of those
strikes was racially motivated, in violation of our decision
in *Batson* v. *Kentucky*, 476 U. S. 79 (1986).  The trial court
and the Georgia Supreme Court rejected Foster's *Batson*
claim.

Foster then sought a writ of habeas corpus from the
Superior Court of Butts County, Georgia, renewing his
*Batson* objection.  That court denied relief, and the Geor-
gia Supreme Court declined to issue the Certificate of
Probable Cause necessary under Georgia law for Foster to
pursue an appeal.  We granted certiorari and now reverse.

I

On the morning of August 28, 1986, police found Queen
Madge White dead on the floor of her home in Rome,
Georgia.  White, a 79-year-old widow, had been beaten,

sexually assaulted, and strangled to death. Her home had been burglarized. Timothy Foster subsequently confessed to killing White, and White's possessions were recovered from Foster's home and from Foster's two sisters. The State indicted Foster on charges of malice murder and burglary. He faced the death penalty. *Foster* v. *State*, 258 Ga. 736, 374 S. E. 2d 188 (1988).

District Attorney Stephen Lanier and Assistant District Attorney Douglas Pullen represented the State at trial. Jury selection proceeded in two phases: removals for cause and peremptory strikes. In the first phase, each prospective juror completed a detailed questionnaire, which the prosecution and defense reviewed. The trial court then conducted a juror-by-juror *voir dire* of approximately 90 prospective jurors. Throughout this process, both parties had the opportunity to question the prospective jurors and lodge challenges for cause. This first phase whittled the list down to 42 "qualified" prospective jurors. Five were black.

In the second phase, known as the "striking of the jury," both parties had the opportunity to exercise peremptory strikes against the array of qualified jurors. Pursuant to state law, the prosecution had ten such strikes; Foster twenty. See Ga. Code Ann. §15–12–165 (1985). The process worked as follows: The clerk of the court called the qualified prospective jurors one by one, and the State had the option to exercise one of its peremptory strikes. If the State declined to strike a particular prospective juror, Foster then had the opportunity to do so. If neither party exercised a peremptory strike, the prospective juror was selected for service. This second phase continued until 12 jurors had been accepted.

The morning the second phase began, Shirley Powell, one of the five qualified black prospective jurors, notified the court that she had just learned that one of her close friends was related to Foster. The court removed Powell

for cause. That left four black prospective jurors: Eddie Hood, Evelyn Hardge, Mary Turner, and Marilyn Garrett.

The striking of the jury then commenced. The State exercised nine of its ten allotted peremptory strikes, removing all four of the remaining black prospective jurors. Foster immediately lodged a *Batson* challenge. The trial court rejected the objection and empaneled the jury. The jury convicted Foster and sentenced him to death.

Following sentencing, Foster renewed his *Batson* claim in a motion for a new trial. After an evidentiary hearing, the trial court denied the motion. The Georgia Supreme Court affirmed, 258 Ga., at 747, 374 S. E. 2d, at 197, and we denied certiorari, *Foster* v. *Georgia*, 490 U. S. 1085 (1989).

Foster subsequently sought a writ of habeas corpus from the Superior Court of Butts County, Georgia, again pressing his *Batson* claim. While the state habeas proceeding was pending, Foster filed a series of requests under the Georgia Open Records Act, see Ga. Code Ann. §§50–18–70 to 50–18–77 (2002), seeking access to the State's file from his 1987 trial. In response, the State disclosed documents related to the jury selection at that trial. Over the State's objections, the state habeas court admitted those documents into evidence. They included the following:

(1) Four copies of the jury venire list. On each copy, the names of the black prospective jurors were highlighted in bright green. A legend in the upper right corner of the lists indicated that the green highlighting "represents Blacks." See, *e.g.*, App. 253. The letter "B" also appeared next to each black prospective juror's name. See, *e.g., ibid.* According to the testimony of Clayton Lundy, an investigator who assisted the prosecution during jury selection, these highlighted venire lists were circulated in the district attorney's office during jury selection. That allowed "everybody in the office"—approximately "10 to 12 people," including "[s]ecretaries, investigators, [and] district attor-

neys"—to look at them, share information, and contribute thoughts on whether the prosecution should strike a particular juror. Pl. Exh. 1, 2 Record 190, 219 (Lundy deposition) (hereinafter Tr.). The documents, Lundy testified, were returned to Lanier before jury selection. *Id.,* at 220.

(2) A draft of an affidavit that had been prepared by Lundy "at Lanier's request" for submission to the state trial court in response to Foster's motion for a new trial. *Id.,* at 203. The typed draft detailed Lundy's views on ten black prospective jurors, stating "[m]y evaluation of the jurors are a[s] follows." App. 343. Under the name of one of those jurors, Lundy had written:

> "If it comes down to having to pick one of the black jurors, [this one] might be okay. This is solely my opinion. . . . Upon picking of the jury after listening to all of the jurors we had to pick, if we had to pick a black juror I recommend that [this juror] be one of the jurors." *Id.*, at 345 (paragraph break omitted).

That text had been crossed out by hand; the version of the affidavit filed with the trial court did not contain the crossed-out language. See *id.*, at 127–129. Lundy testified that he "guess[ed]" the redactions had been done by Lanier. Tr. 203.

(3) Three handwritten notes on black prospective jurors Eddie Hood, Louise Wilson, and Corrie Hinds. Annotations denoted those individuals as "B#1," "B#2," and "B#3," respectively. App. 295–297. Lundy testified that these were examples of the type of "notes that the team— the State would take down during voir dire to help select the jury in Mr. Foster's case." Tr. 208–210.

(4) A typed list of the qualified jurors remaining after *voir dire.* App. 287–290. It included "Ns" next to ten jurors' names, which Lundy told the state habeas court "signif[ied] the ten jurors that the State had strikes for during jury selection." Tr. 211. Such an "N" appeared

alongside the names of all five qualified black prospective jurors. See App. 287–290. The file also included a handwritten version of the same list, with the same markings. *Id.*, at 299–300; see Tr. 212. Lundy testified that he was unsure who had prepared or marked the two lists.

(5) A handwritten document titled "definite NO's," listing six names. The first five were those of the five qualified black prospective jurors. App. 301. The State concedes that either Lanier or Pullen compiled the list, which Lundy testified was "used for preparation in jury selection." Tr. 215; Tr. of Oral Arg. 45.

(6) A handwritten document titled "Church of Christ." A notation on the document read: "<u>NO</u>. No <u>Black</u> Church." App. 302.

(7) The questionnaires that had been completed by several of the black prospective jurors. On each one, the juror's response indicating his or her race had been circled. *Id.,* at 311, 317, 323, 329, 334.

In response to the admission of this evidence, the State introduced short affidavits from Lanier and Pullen. Lanier's affidavit stated:

> "I did not make any of the highlighted marks on the jury venire list. It was common practice in the office to highlight in yellow those jurors who had prior case experience. I did not instruct anyone to make the green highlighted marks. I reaffirm my testimony made during the motion for new trial hearing as to how I used my peremptory jury strikes and the basis and reasons for those strikes." *Id.*, at 169 (paragraph numeral omitted).

Pullen's affidavit averred:

> "I did not make any of the highlighted marks on the jury venire list, and I did not instruct anyone else to make the highlighted marks. I did not rely on the highlighted jury venire list in making my decision on

how to use my peremptory strikes."  *Id*., at 170–171
(paragraph numeral omitted).

Neither affidavit provided further explanation of the
documents, and neither Lanier nor Pullen testified in the
habeas proceeding.

After considering the evidence, the state habeas court
denied relief.  The court first stated that, "[a]s a prelimi-
nary matter," Foster's *Batson* claim was "not reviewable
based on the doctrine of res judicata" because it had been
"raised and litigated adversely to [Foster] on his direct
appeal to the Georgia Supreme Court."  App. 175.  The
court nonetheless announced that it would "mak[e] find-
ings of fact and conclusions of law" on that claim.  *Id.,* at
191.  Based on what it referred to as a "*Batson* . . . analy-
sis," the court concluded that Foster's "renewed *Batson*
claim is without merit," because he had "fail[ed] to demon-
strate purposeful discrimination."  *Id.,* at 192, 195, 196.

The Georgia Supreme Court denied Foster the "Certifi-
cate of Probable Cause" necessary under state law for him
to pursue an appeal, determining that his claim had no
"arguable merit."  *Id*., at 246; see Ga. Code Ann. §9–14–52
(2014); Ga. Sup. Ct. Rule 36 (2014).  We granted certiorari.
575 U. S. ___ (2015).

## II

Before turning to the merits of Foster's *Batson* claim, we
address a threshold issue.  Neither party contests our
jurisdiction to review Foster's claims, but we "have an
independent obligation to determine whether subject-
matter jurisdiction exists, even in the absence of a chal-
lenge from any party."  *Arbaugh* v. *Y & H Corp.*, 546 U. S.
500, 514 (2006).

This Court lacks jurisdiction to entertain a federal claim
on review of a state court judgment "if that judgment rests
on a state law ground that is both 'independent' of the
merits of the federal claim and an 'adequate' basis for the

court's decision." *Harris* v. *Reed*, 489 U. S. 255, 260 (1989).

The state habeas court noted that Foster's *Batson* claim was "not reviewable based on the doctrine of res judicata" under Georgia law. App. 175. The Georgia Supreme Court's unelaborated order on review provides no reasoning for its decision.[1] That raises the question whether the Georgia Supreme Court's order—the judgment from which Foster sought certiorari[2]—rests on an adequate and independent state law ground so as to preclude our jurisdiction over Foster's federal claim.

We conclude that it does not. When application of a state law bar "depends on a federal constitutional ruling, the state-law prong of the court's holding is not independent of federal law, and our jurisdiction is not precluded." *Ake* v. *Oklahoma*, 470 U. S. 68, 75 (1985); see also *Three Affiliated Tribes of Fort Berthold Reservation* v. *Wold Engineering, P. C.*, 467 U. S. 138, 152 (1984).

—————

[1] The order stated, in its entirety: "Upon consideration of the Application for Certificate of Probable Cause to appeal the denial of habeas corpus, it is ordered that it be hereby denied. All the Justices concur, except Benham, J., who dissents." App. 246.

[2] We construe Foster's petition for writ of certiorari as seeking review of the Georgia Supreme Court's order denying him a "Certificate of Probable Cause." App. 246. The Georgia Supreme Court Rules provide that such a certificate "*will* be issued where there is arguable merit." Rule 36 (emphasis added); see also *Hittson* v. *GDCP Warden*, 759 F. 3d 1210, 1231–1232 (CA11 2014). A decision by the Georgia Supreme Court that Foster's appeal had no "arguable merit" would seem to be a decision on the merits of his claim. In such circumstances the Georgia Supreme Court's order is subject to review in this Court pursuant to a writ of certiorari under 28 U. S. C. §1257(a). *R. J. Reynolds Tobacco Co.* v. *Durham County*, 479 U. S. 130, 138–139 (1986); see *Sears* v. *Upton*, 561 U. S. 945 (2010) (*per curiam*) (exercising jurisdiction over order from Georgia Supreme Court denying a Certificate of Probable Cause). We reach the conclusion that such an order is a decision on the merits "in the absence of positive assurance to the contrary" from the Georgia Supreme Court. *R. J. Reynolds*, 479 U. S., at 138.

In this case, the Georgia habeas court's analysis in the section of its opinion labeled "*Batson* claim" proceeded as follows:

> "The [State] argues that this claim is not reviewable due to the doctrine of res judicata. However, because [Foster] claims that additional evidence allegedly supporting this ground was discovered subsequent to the Georgia Supreme Court's ruling [on direct appeal], this court will review the *Batson* claim as to whether [Foster] has shown any change in the facts sufficient to overcome the res judicata bar." App. 192.

To determine whether Foster had alleged a sufficient "change in the facts," the habeas court engaged in four pages of what it termed a "*Batson* . . . analysis," in which it evaluated the original trial record and habeas record, including the newly uncovered prosecution file. *Id.,* at 192–196. Ultimately, that court concluded that Foster's "renewed *Batson* claim is *without merit.*" *Id.,* at 196 (emphasis added).

In light of the foregoing, it is apparent that the state habeas court's application of res judicata to Foster's *Batson* claim was not independent of the merits of his federal constitutional challenge.[3] That court's invocation of res

_____

[3] Contrary to the dissent's assertion, see *post*, at 6–8, it is perfectly consistent with this Court's past practices to review a lower court decision—in this case, that of the Georgia habeas court—in order to ascertain whether a federal question may be implicated in an unreasoned summary order from a higher court. See, *e.g.*, *R. J. Reynolds*, 479 U. S., at 136–139 (exercising §1257 jurisdiction over unreasoned judgment by the North Carolina Supreme Court after examining grounds of decision posited by North Carolina Court of Appeal); see also Stephen M. Shapiro, Kenneth S. Geller, Timothy S. Bishop, Edward A. Hartnett, Dan Himmelfarb, Supreme Court Practice 211 (10th ed. 2013) ("[W]here the state court opinion fails to yield precise answers as to the grounds of decision, the Court may be forced to turn to other parts of the record, such as pleadings, motions, and trial court rulings, to determine if a federal claim is so central to the controversy as to

judicata therefore poses no impediment to our review of Foster's *Batson* claim. See *Ake*, 470 U. S., at 75.[4]

## III
## A

The "Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Snyder* v. *Louisiana*, 552 U. S. 472, 478 (2008) (internal quotation marks omitted). Our decision in *Batson* v. *Kentucky*, 476 U. S. 79, provides a three-step process for determining when a strike is discriminatory:

> "First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination." *Snyder*, 552 U. S., at 476–477 (internal quotation marks and brackets omitted).

———————

preclude resting the judgment on independent and adequate state grounds."). And even the dissent does not follow its own rule. It too goes beyond the unreasoned order of the Georgia Supreme Court in determining that the "likely explanation for the court's denial of habeas relief is that Foster's claim is procedurally barred." *Post*, at 2. There would be no way to know this, of course, from the face of the Georgia Supreme Court's summary order.

[4] The concurrence notes that the "res judicata rule applied by the Superior Court in this case is quite different" from the state procedural bar at issue in *Ake*, which was "entirely dependent on federal law." *Post*, at 8. But whether a state law determination is characterized as "entirely dependent on," *ibid.*, "resting primarily on," *Stewart* v. *Smith*, 536 U. S. 856, 860 (2002) (*per curiam*), or "influenced by" a question of federal law, *Three Affiliated Tribes of Fort Berthold Reservation* v. *Wold Engineering, P. C.*, 467 U. S. 138, 152 (1984), the result is the same: the state law determination is not independent of federal law and thus poses no bar to our jurisdiction.

Both parties agree that Foster has demonstrated a prima facie case, and that the prosecutors have offered race-neutral reasons for their strikes. We therefore address only *Batson*'s third step. That step turns on factual determinations, and, "in the absence of exceptional circumstances," we defer to state court factual findings unless we conclude that they are clearly erroneous. *Synder*, 552 U. S., at 477.

Before reviewing the factual record in this case, a brief word is in order regarding the contents of the prosecution's file that Foster obtained through his Georgia Open Records Act requests. Pursuant to those requests, Foster received a "certif[ied] . . . true and correct copy of 103 pages of the State's case file" from his 1987 trial. App. 247. The State argues that "because [Foster] did not call either of the prosecutors to the stand" to testify in his state habeas proceedings, "he can only speculate as to the meaning of various markings and writings" on those pages, "the author of many of them, and whether the two prosecutors at trial (District Attorney Lanier and Assistant District Attorney Pullen) even saw many of them." Brief for Respondent 20. For these reasons, the State argues, "none of the specific pieces of new evidence [found in the file] shows an intent to discriminate." *Ibid.* (capitalization omitted). For his part, Foster argues that "[t]here is no question that the prosecutors used the lists and notes, which came from the prosecution's file and were certified as such," and therefore the "source of the lists and notes, their timing, and their purpose is hardly 'unknown' or based on 'conjecture.'" Reply Brief 4–5 (quoting Brief for Respondent 27–28).

The State concedes that the prosecutors themselves authored some documents, see, *e.g.*, Tr. of Oral Arg. 45 (admitting that one of the two prosecutors must have written the list titled "definite NO's"), and Lundy's testimony strongly suggests that the prosecutors viewed oth-

ers, see, *e.g.*, Tr. 220 (noting that the highlighted jury venire lists were returned to Lanier prior to jury selection). There are, however, genuine questions that remain about the provenance of other documents. Nothing in the record, for example, identifies the author of the notes that listed three black prospective jurors as "B#1," "B#2," and "B#3." Such notes, then, are not necessarily attributable directly to the prosecutors themselves. The state habeas court was cognizant of those limitations, but nevertheless admitted the file into evidence, reserving "a determination as to what weight the Court is going to put on any of [them]" in light of the objections urged by the State. 1 Record 20.

We agree with that approach. Despite questions about the background of particular notes, we cannot accept the State's invitation to blind ourselves to their existence. We have "made it clear that in considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted." *Snyder,* 552 U. S., at 478. As we have said in a related context, "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial . . . evidence of intent as may be available." *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252, 266 (1977). At a minimum, we are comfortable that all documents in the file were authored by *someone* in the district attorney's office. Any uncertainties concerning the documents are pertinent only as potential limits on their probative value.

## B

Foster centers his *Batson* claim on the strikes of two black prospective jurors, Marilyn Garrett and Eddie Hood. We turn first to Marilyn Garrett. According to Lanier, on the morning that the State was to use its strikes he had

not yet made up his mind to remove Garrett. Rather, he decided to strike her only after learning that he would not need to use a strike on another black prospective juror, Shirley Powell, who was excused for cause that morning.

Ultimately, Lanier did strike Garrett. In justifying that strike to the trial court, he articulated a laundry list of reasons. Specifically, Lanier objected to Garrett because she: (1) worked with disadvantaged youth in her job as a teacher's aide; (2) kept looking at the ground during *voir dire*; (3) gave short and curt answers during *voir dire*; (4) appeared nervous; (5) was too young; (6) misrepresented her familiarity with the location of the crime; (7) failed to disclose that her cousin had been arrested on a drug charge; (8) was divorced; (9) had two children and two jobs; (10) was asked few questions by the defense; and (11) did not ask to be excused from jury service. See App. 55–57 (pretrial hearing); *id.*, at 93–98, 105, 108, 110–112 (new trial hearing); Record in No. 45609 (Ga. 1988), pp. 439–440 (hereinafter Trial Record) (brief in opposition to new trial).

The trial court accepted Lanier's justifications, concluding that "[i]n the totality of circumstances," there was "no discriminatory intent, and that there existed reasonably clear, specific, and legitimate reasons" for the strike. App. 143. On their face, Lanier's justifications for the strike seem reasonable enough. Our independent examination of the record, however, reveals that much of the reasoning provided by Lanier has no grounding in fact.

Lanier's misrepresentations to the trial court began with an elaborate explanation of how he ultimately came to strike Garrett:

  "[T]he prosecution considered this juror [to have] the most potential to choose from out of the four remaining blacks in the 42 [member] panel venire. However, a system of events took place on the morning of jury

selection that caused the excusal of this juror. The [S]tate had, in his jury notes, *listed this juror as questionable*. The four negative challenges were allocated for Hardge, Hood, Turner and Powell. . . . But on the morning of jury selection, Juror Powell was excused for cause with no objections by [d]efense counsel. She was replaced by Juror Cadle [who] was acceptable to the State. This left the State with an additional strike it had not anticipated or allocated. Consequently, the State had to choose between [white] Juror Blackmon or Juror Garrett, the only two *questionable* jurors the State had left on the list." Trial Record 438–440 (brief in opposition to new trial) (emphasis added and citations omitted).

Lanier then offered an extensive list of reasons for striking Garrett and explained that "[t]hese factors, with no reference to race, were considered by the prosecutor in this particular case to result in a juror less desirable from the prosecutor's viewpoint than Juror Blackmon." *Id.,* at 441 (emphasis deleted).

Lanier then compared Blackmon to Garrett. In contrast to Garrett, Juror Blackmon

"was 46 years old, married 13 years to her husband who works at GE, buying her own home and [was recommended by a third party to] this prosecutor. She was no longer employed at Northwest Georgia Regional Hospital and she attended Catholic church on an irregular basis. She did not hesitate when answering the questions concerning the death penalty, had good eye contact with the prosecutor and gave good answers on the insanity issue. She was perceived by the prosecutor as having a stable home environment, of the right age and no association with any disadvantaged youth organizations." *Ibid.*

Lanier concluded that "the chances of [Blackmon] return-

ing a death sentence were greater when all these factors were considered than Juror Garrett. Consequently, Juror Garrett was excused." *Ibid.*

The trial court accepted this explanation in denying Foster's motion for a new trial. See App. 142–143. But the predicate for the State's account—that Garrett was "listed" by the prosecution as "questionable," making that strike a last-minute race-neutral decision—was false.

During jury selection, the State went first. As a consequence, the defense could accept any prospective juror not struck by the State without any further opportunity for the State to use a strike against that prospective juror. Accordingly, the State had to "pretty well select the ten specific people [it] intend[ed] to strike" in advance. *Id.*, at 83 (pretrial hearing); accord, *ibid.* ("[T]he ten people that we felt very uncomfortable with, we have to know up front." (Lanier testimony)). The record evidence shows that Garrett was one of those "ten specific people."

That much is evident from the "definite NO's" list in the prosecution's file. Garrett's name appeared on that list, which the State concedes was written by one of the prosecutors. Tr. of Oral Arg. 45. That list belies Lanier's assertion that the State considered allowing Garrett to serve. The title of the list meant what it said: Garrett was a "*definite* NO." App. 301 (emphasis added). The State from the outset was intent on ensuring that *none* of the jurors on that list would serve.

The first five names on the "definite NO's" list were Eddie Hood, Evelyn Hardge, Shirley Powell, Marilyn Garrett, and Mary Turner. All were black. The State struck each one except Powell (who, as discussed, was excused for cause at the last minute—though the prosecution informed the trial court that the "State was not, under any circumstances, going to take [Powell]," Trial Record 439 (brief in opposition to new trial)). Only in the number six position did a white prospective juror appear,

and she had informed the court during *voir dire* that she could not "say positively" that she could impose the death penalty even if the evidence warranted it. 6 Tr. in No. 86–2218–2 (Super. Ct. Floyd Cty., Ga., 1987), p. 1152 (hereinafter Trial Transcript); see also *id.,* at 1153–1158. In short, contrary to the prosecution's submissions, the State's resolve to strike Garrett was never in doubt. See also App. 290 ("N" appears next to Garrett's name on juror list); *id.,* at 300 (same).

The State attempts to explain away the contradiction between the "definite NO's" list and Lanier's statements to the trial court as an example of a prosecutor merely "misspeak[ing]." Brief for Respondent 51. But this was not some off-the-cuff remark; it was an intricate story expounded by the prosecution in writing, laid out over three single-spaced pages in a brief filed with the trial court.

Moreover, several of Lanier's reasons for *why* he chose Garrett over Blackmon are similarly contradicted by the record. Lanier told the court, for example, that he struck Garrett because "the defense did not ask her questions about" pertinent trial issues such as her thoughts on "insanity" or "alcohol," or "much questions on publicity." App. 56 (pretrial hearing). But the trial transcripts reveal that the defense asked her several questions on all three topics. See 5 Trial Transcript 955–956 (two questions on insanity and one on mental illness); *ibid.* (four questions on alcohol); *id.,* at 956–957 (five questions on publicity).

Still other explanations given by the prosecution, while not explicitly contradicted by the record, are difficult to credit because the State willingly accepted white jurors with the same traits that supposedly rendered Garrett an unattractive juror. Lanier told the trial court that he struck Garrett because she was divorced. App. 56 (pretrial hearing). But he declined to strike three out of the four prospective white jurors who were also divorced. See Juror Questionnaire in No. 86–2218–2 (Super. Ct. Floyd

Cty., Ga., 1987) (hereinafter Juror Questionnaire), for Juror No. 23, p. 2 (juror Coultas, divorced); *id.*, No. 33, p. 2 (juror Cochran, divorced); *id.*, No. 107, p. 2 (juror Hatch, divorced); App. 23–24, 31 (State accepting jurors Coultas, Cochran, and Hatch). Additionally, Lanier claimed that he struck Garrett because she was too young, and the "State was looking for older jurors that would not easily identify with the defendant." Trial Record 439; see App. 55 (pretrial hearing). Yet Garrett was 34, and the State declined to strike eight white prospective jurors under the age of 36. See Trial Record 439; Juror Questionnaire No. 4, p. 1; *id.*, No. 10, p. 1; *id.*, No. 23, p. 1; *id.*, No. 48, p. 1; *id.*, No. 70, p. 1; *id.*, No. 71, p. 1; *id.*, No. 92, p. 1; *id.*, No. 106, p. 1; see App. 22–31. Two of those white jurors served on the jury; one of those two was only 21 years old. See *id.,* at 35.

Lanier also explained to the trial court that he struck Garrett because he "felt that she was less than truthful" in her answers in *voir dire. Id.,* at 108 (new trial hearing). Specifically, the State pointed the trial court to the following exchange:

"[Court]: Are you familiar with the neighborhood where [the victim] lived, North Rome?
"[Garrett]: No." 5 Trial Transcript 950–951.

Lanier, in explaining the strike, told the trial court that in apparent contradiction to that exchange (which represented the only time that Garrett was asked about the topic during *voir dire*), he had "noted that [Garrett] attended Main High School, which is only two blocks from where [the victim] lived and certainly in the neighborhood. She denied any knowledge of the area." Trial Record 439 (brief in opposition to new trial).

We have no quarrel with the State's general assertion that it "could not trust someone who gave materially untruthful answers on voir dire." *Foster*, 258 Ga., at 739,

374 S. E. 2d, at 192. But even this otherwise legitimate reason is difficult to credit in light of the State's acceptance of (white) juror Duncan. Duncan gave practically the same answer as Garrett did during *voir dire*:

> "[Court]: Are you familiar with the neighborhood in which [the victim] live[d]?
>
> "[Duncan]: No. I live in Atteiram Heights, but it's not—I'm not familiar with up there, you know." 5 Trial Transcript 959.

But, as Lanier was aware, Duncan's "residence [was] less than a half a mile from the murder scene" and her workplace was "located less than 250 yards" away. Trial Record 430 (brief in opposition to new trial).

In sum, in evaluating the strike of Garrett, we are not faced with a single isolated misrepresentation.

## C

We turn next to the strike of Hood. According to Lanier, Hood "was exactly what [the State] was looking for in terms of age, between forty and fifty, good employment and married." App. 44 (pretrial hearing). The prosecution nonetheless struck Hood, giving eight reasons for doing so. Hood: (1) had a son who was the same age as the defendant and who had previously been convicted of a crime; (2) had a wife who worked in food service at the local mental health institution; (3) had experienced food poisoning during *voir dire*; (4) was slow in responding to death penalty questions; (5) was a member of the Church of Christ; (6) had a brother who counseled drug offenders; (7) was not asked enough questions by the defense during *voir dire*; and (8) asked to be excused from jury service. See *id.*, at 44–47; *id.*, at 86, 105, 110–111 (new trial hearing); Trial Record 433–435 (brief in opposition to new trial). An examination of the record, however, convinces us that many of these justifications cannot be credited.

As an initial matter, the prosecution's principal reasons for the strike shifted over time, suggesting that those reasons may be pretextual. In response to Foster's pretrial *Batson* challenge, District Attorney Lanier noted all eight reasons, but explained:

> "*The only thing I was concerned about*, and I will state it for the record. He has an eighteen year old son which is about the same age as the defendant.
>
> "In my experience prosecuting over twenty-five murder cases . . . individuals having the same son as [a] defendant who is charged with murder [have] serious reservations and are more sympathetic and lean toward that particular person.
>
> "It is ironic that his son, . . . Darrell Hood[,] has been sentenced . . . by the Court here, to theft by taking on April 4th, 1982. . . . [T]heft by taking is basically the same thing that this defendant is charged with." App. 44–45 (pretrial hearing; emphasis added).

But by the time of Foster's subsequent motion for a new trial, Lanier's focus had shifted. He still noted the similarities between Hood's son and Foster, see *id.*, at 105 (new trial hearing), but that was no longer the key reason behind the strike. Lanier instead told the court that his paramount concern was Hood's membership in the Church of Christ: "The Church of Christ people, while they may not take a formal stand against the death penalty, they are very, very reluctant to vote for the death penalty." *Id.*, at 84 (new trial hearing); accord, Trial Record 434–435 ("It is the opinion of this prosecutor that in a death penalty case, Church of Christ affiliates are reluctant to return a verdict of death." (brief in opposition to new trial)). Hood's religion, Lanier now explained, was the most important factor behind the strike: "I evaluated the whole Eddie Hood. . . . And *the bottom line* on Eddie Hood is the Church of Christ affiliation." App. 110–111 (new trial

hearing; emphasis added).

Of course it is possible that Lanier simply misspoke in one of the two proceedings. But even if that were so, we would expect at least *one* of the two purportedly principal justifications for the strike to withstand closer scrutiny. Neither does.

Take Hood's son. If Darrell Hood's age was the issue, why did the State accept (white) juror Billy Graves, who had a 17-year-old son? Juror Questionnaire No. 31, p. 3; see App. 24. And why did the State accept (white) juror Martha Duncan, even though she had a 20-year-old son? Juror Questionnaire No. 88, p. 3; see App. 30.

The comparison between Hood and Graves is particularly salient. When the prosecution asked Hood if Foster's age would be a factor for him in sentencing, he answered "None whatsoever." Trial Transcript 280. Graves, on the other hand, answered the same question "probably so." *Id.*, at 446. Yet the State struck Hood and accepted Graves.

The State responds that Duncan and Graves were not similar to Hood because Hood's son had been convicted of theft, while Graves's and Duncan's sons had not. See Brief for Respondent 34–35; see also App. 135–136 ("While the defense asserts that the state used different standards for white jurors, insofar as many of them had children near the age of the Defendant, the Court believes that [Darrell Hood's] conviction is a distinction that makes the difference." (trial court opinion denying new trial)). Lanier had described Darrell Hood's conviction to the trial court as being for "basically the same thing that this defendant is charged with." *Id.*, at 45 (pretrial hearing). Nonsense. Hood's son had received a 12-month suspended sentence for stealing hubcaps from a car in a mall parking lot five years earlier. Trial Record 446. Foster was charged with capital murder of a 79-year-old widow after a brutal sexual assault. The "implausible" and "fantastic"

assertion that the two had been charged with "basically the same thing" supports our conclusion that the focus on Hood's son can only be regarded as pretextual. *Miller-El* v. *Cockrell*, 537 U. S. 322, 339 (2003); see also *ibid.* ("Credibility can be measured by, among other factors, . . . how reasonable, or how improbable, the [State's] explanations are.").

The prosecution's second principal justification for striking Hood—his affiliation with the Church of Christ, and that church's alleged teachings on the death penalty—fares no better. Hood asserted no fewer than four times during *voir dire* that he could impose the death penalty.[5] A prosecutor is entitled to disbelieve a juror's *voir dire* answers, of course. But the record persuades us that Hood's race, and not his religious affiliation, was Lanier's true motivation.

The first indication to that effect is Lanier's mischaracterization of the record. On multiple occasions, Lanier asserted to the trial court that three white prospective jurors who were members of the Church of Christ had been struck for cause due to their opposition to the death penalty. See App. 46 ("[Hood's] religious preference is Church of Christ. There have been [three] other jurors that have been excused for cause by agreement that belong to the Church of Christ, Juror No. 35, 53, and 78." (pretrial hearing)); *id.,* at 114 ("Three out of four jurors who professed to be members of the Church of Christ,

---

[5] See 2 Trial Transcript 269 ("[Court]: Are you opposed to or against the death penalty? A: I am not opposed to it. Q: If the facts and circumstances warrant the death penalty, are you prepared to vote for the death penalty? A: Yes."); *id.,* at 270 ("[Court]: [A]re you prepared to vote for the death penalty? Now you said yes to that. A: All right. Q: Are you still saying yes? A: Uh-huh."); *id.,* at 274 ("[Court]: If the evidence warrants the death penalty, could you vote for the death penalty? A: Yes. I could vote for the death penalty."); *id.,* at 278 ("[Pullen]: And if the facts and circumstances warranted, you could vote to impose the death penalty? Yes.").

went off for [cause related to opposition to the death penalty]." (new trial hearing)); Trial Record 435 ("Church of Christ jurors Terry (#35), Green (#53), and Waters (#78) [were] excused for cause due to feeling[s] against the death penalty." (brief in opposition to new trial)).

That was not true. One of those prospective jurors was excused before even being questioned during *voir dire* because she was five-and-a-half months pregnant. 5 Trial Transcript 893. Another was excused by the agreement of both parties because her answers on the death penalty made it difficult to ascertain her precise views on capital punishment. See Brief for Respondent 39 ("[I]t was entirely unclear if [this juror] understood any of the trial court's questions and her answers are equivocal at best."). And the judge found cause to dismiss the third because she had already formed an opinion about Foster's guilt. See 3 Trial Transcript 558 ("[Court]: And you have made up your mind already as to the guilt of the accused? A: Yes, sir. [Court]: I think that's cause.").

The prosecution's file fortifies our conclusion that any reliance on Hood's religion was pretextual. The file contains a handwritten document titled "Church of Christ." The document notes that the church "doesn't take a stand on [the] Death Penalty," and that the issue is "left for each individual member." App. 302. The document then states: "NO. NO Black Church." *Ibid*. The State tries to downplay the significance of this document by emphasizing that the document's author is unknown. That uncertainty is pertinent. But we think the document is nonetheless entitled to significant weight, especially given that it is consistent with our serious doubts about the prosecution's account of the strike.

Many of the State's secondary justifications similarly come undone when subjected to scrutiny. Lanier told the trial court that Hood "appeared to be confused and slow in responding to questions concerning his views on the death

penalty." Trial Record 434 (brief in opposition to new trial). As previously noted, however, Hood unequivocally voiced his willingness to impose the death penalty, and a white juror who showed similar confusion served on the jury. Compare 5 Trial Transcript 1100–1101 (white juror Huffman's answers) with 2 *id.,* at 269–278 (Hood's answers); see App. 35. According to the record, such confusion was not uncommon. See *id.,* at 138 ("The Court notes that [Hood's] particular confusion about the death penalty questions was not unusual."); accord, 5 Trial Transcript 994 ("[Court]: I think these questions should be reworded. I haven't had a juror yet that understood what that meant."); *id.,* at 1101–1102 ("[Court]: I still say that these questions need changing overnight, because one out of a hundred jurors, I think is about all that's gone along with knowing what [you're asking].").

Lanier also stated that he struck Hood because Hood's wife worked at Northwest Regional Hospital as a food services supervisor. App. 45 (pretrial hearing). That hospital, Lanier explained, "deals a lot with mentally disturbed, mentally ill people," and so people associated with it tend "to be more sympathetic to the underdog." *Ibid.* But Lanier expressed no such concerns about white juror Blackmon, who had worked at the same hospital. Blackmon, as noted, served on the jury.

Lanier additionally stated that he struck Hood because the defense "didn't ask [Hood] any question[s] about the age of the defendant," "his feelings about criminal responsibility involved in insanity," or "publicity." *Id.,* at 47. Yet again, the trial transcripts clearly indicate the contrary. See 2 Trial Transcript 280 ("Q: Is age a factor to you in trying to determine whether or not a defendant should receive a life sentence or a death sentence? A: None whatsoever."); *ibid.* ("Q: Do you have any feeling about the insanity defense? A: Do I have any opinion about that? I have not formed any opinion about that."); *id.,* at 281 ("Q:

Okay. The publicity that you have heard, has that publicity affected your ability to sit as a juror in this case and be fair and impartial to the defendant? A: No, it has no effect on me.").

### D

As we explained in *Miller-El* v. *Dretke*, "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack [panelist] who is permitted to serve, that is evidence tending to prove purposeful discrimination." 545 U. S. 231, 241 (2005). With respect to both Garrett and Hood, such evidence is compelling. But that is not all. There are also the shifting explanations, the misrepresentations of the record, and the persistent focus on race in the prosecution's file. Considering all of the circumstantial evidence that "bear[s] upon the issue of racial animosity," we are left with the firm conviction that the strikes of Garrett and Hood were "motivated in substantial part by discriminatory intent." *Snyder*, 552 U. S., at 478, 485.[6]

### IV

Throughout all stages of this litigation, the State has strenuously objected that "race [was] not a factor" in its jury selection strategy. App. 41 (pretrial hearing); but see *id.,* at 120 (Lanier testifying that the strikes were "based on many factors and not *purely* on race." (emphasis added) (new trial hearing)). Indeed, at times the State has been downright indignant. See Trial Record 444 ("The Defenses's [*sic*] misapplication of the law and erroneous distor-

—————————

[6] In *Snyder*, we noted that we had not previously allowed the prosecution to show that "a discriminatory intent [that] was a substantial or motivating factor" behind a strike was nevertheless not "determinative" to the prosecution's decision to exercise the strike. 552 U. S., at 485. The State does not raise such an argument here and so, as in *Snyder*, we need not decide the availability of such a defense.

tion of the facts are an attempt to discredit the pro-
secutor. . . . The State and this community demand an
apology." (brief in opposition to new trial)).

The contents of the prosecution's file, however, plainly
belie the State's claim that it exercised its strikes in a
"color-blind" manner. App. 41, 60 (pretrial hearing). The
sheer number of references to race in that file is arresting.
The State, however, claims that things are not quite as
bad as they seem. The focus on black prospective jurors, it
contends, does not indicate any attempt to exclude them
from the jury. It instead reflects an effort to ensure that
the State was "thoughtful and non-discriminatory in [its]
consideration of black prospective jurors [and] to develop
and maintain detailed information on those prospective
jurors in order to properly defend against any suggestion
that decisions regarding [its] selections were pretextual."
Brief for Respondent 6. *Batson*, after all, had come down
only months before Foster's trial. The prosecutors, accord-
ing to the State, were uncertain what sort of showing
might be demanded of them and wanted to be prepared.

This argument falls flat. To begin, it "reeks of after-
thought," *Miller-El*, 545 U. S., at 246, having never before
been made in the nearly 30-year history of this litigation:
not in the trial court, not in the state habeas court, and
not even in the State's brief in opposition to Foster's peti-
tion for certiorari.

In addition, the focus on race in the prosecution's file
plainly demonstrates a concerted effort to keep black
prospective jurors off the jury. The State argues that it
"was actively seeking a black juror." Brief for Respondent
12; see also App. 99 (new trial hearing). But this claim is
not credible. An "N" appeared next to each of the black
prospective jurors' names on the jury venire list. See, *e.g.,
id.,* at 253. An "N" was also noted next to the name of
each black prospective juror on the list of the 42 qualified
prospective jurors; each of those names also appeared on

the "definite NO's" list. See *id.,* 299–301. And a draft affidavit from the prosecution's investigator stated his view that "[i]f it comes down to *having to pick* one of the black jurors, [Marilyn] Garrett, might be okay." *Id.,* at 345 (emphasis added); see also *ibid.* (recommending Garrett "if we *had to pick* a black juror" (emphasis added)). Such references are inconsistent with attempts to "actively see[k]" a black juror.

The State's new argument today does not dissuade us from the conclusion that its prosecutors were motivated in substantial part by race when they struck Garrett and Hood from the jury 30 years ago. Two peremptory strikes on the basis of race are two more than the Constitution allows.

The order of the Georgia Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 14–8349

_____

## TIMOTHY TYRONE FOSTER, PETITIONER *v.* BRUCE CHATMAN, WARDEN

### ON WRIT OF CERTIORARI TO THE SUPREME COURT OF GEORGIA

[May 23, 2016]

JUSTICE ALITO, concurring in the judgment.

I agree with the Court that the decision of the Supreme Court of Georgia cannot be affirmed and that the case must be remanded. I write separately to explain my understanding of the role of state law in the proceedings that must be held on remand.

I

As the Court recounts, in August 1986, Queen Madge White, a 79-year-old retired schoolteacher, was sexually assaulted and brutally murdered in her home in Rome, Georgia. Her home was ransacked, and various household items were stolen. *Foster* v. *State*, 258 Ga. 736, 374 S. E. 2d 188 (1988). About a month after the murder, police officers were called to respond to a local disturbance. The complainant, Lisa Stubbs, told them that her boyfriend, petitioner Timothy Foster, had killed White and had distributed the goods stolen from White's home to Stubbs and family members. Tr. 1719–1723. Officers arrested Foster, who confessed to the murder and robbery, 258 Ga., at 736, 374 S. E. 2d, at 190, and the police recovered some of the stolen goods.

Foster was put on trial for White's murder, convicted, and sentenced to death. Before, during, and after his trial, Foster argued that the prosecution violated his rights

under this Court's then-recent decision in *Batson* v. *Kentucky*, 476 U. S. 79 (1986), by peremptorily challenging all the prospective jurors who were black. After the Georgia Supreme Court rejected Foster's *Batson a*rgument on direct appeal, he filed a petition for a writ of certiorari in this Court, but his petition did not raise a *Batson* claim,[1] and the petition was denied. *Foster* v. *Georgia*, 490 U. S. 1085 (1989).

In July 1989, Foster filed a state habeas petition in the Superior Court of Butts County, Georgia. For the next 10 years, most of Foster's claims (including his *Batson* claim) were held in abeyance while the Georgia courts adjudicated Foster's claim that he is "mentally retarded" and thus cannot be executed under Georgia law. *Zant* v. *Foster*, 261 Ga. 450, 406 S. E. 2d 74 (1991). After extensive court proceedings, including two visits to the State Supreme Court,[2] additional petitions for certiorari to this Court,[3] and a jury trial on the issue of intellectual disability, Foster was denied relief on that claim. He then amended his habeas petition, and the Superior Court considered the many other claims asserted in his petition, including his *Batson* claim. In support of that claim, Foster offered new evidence, namely, the prosecution's jury selection notes, which he had obtained through a Georgia open-records request. These notes showed that someone had highlighted the names of black jurors and had written the letter "B" next to their names.

The Superior Court issued a written decision in which it evaluated Foster's habeas claims. The opinion began by noting that many of his claims were barred by res judi-

—————————

[1] Nor did his petition for rehearing, which was also denied. *Foster* v. *Georgia*, 492 U. S. 928 (1989).

[2] See *Zant* v. *Foster*, 261 Ga. 450, 406 S. E. 2d 74 (1991); *Foster* v. *State*, 272 Ga. 69, 525 S. E. 2d 78 (2000).

[3] See *Foster* v. *Georgia*, 503 U. S. 921 (1992); *Foster* v. *Georgia*, 531 U. S. 890, reh'g denied, 531 U. S. 1045 (2000).

cata. The opinion stated: "[T]his court notes . . . that the following claims are not reviewable based on the doctrine of res judicata, as the claims were raised and litigated adversely to the petitioner on his direct appeal to the Georgia Supreme Court." App. 175. Included in the list of barred claims was "Petitioner['s] alleg[ation] that the State used peremptory challenges in a racially discriminatory manner in violation of *Batson*." *Id.*, at 175–176.

Later in its opinion, the Superior Court again referred to the *Batson* claim and wrote as follows:

> "The Respondent argues that this claim is not reviewable due to the doctrine of res judicata. However, because the Petitioner claims that additional evidence allegedly supporting this ground was discovered subsequent to the Georgia Supreme Court's ruling in *Foster v. State*, 258 Ga. 736 (1988) [the decision affirming Foster's conviction on direct appeal], this court will review the *Batson* claim as to whether Petitioner has shown any change in the facts sufficient to overcome the res judicata bar." *Id.,* at 192.

The court then reviewed the evidence and concluded that it "[could not] find that the highlighting of the names of black jurors and the notation of their race can serve to override this previous consideration [on direct appeal]." *Id.,* at 193. Because "all jurors in this case, regardless of race, were thoroughly investigated and considered before the State exercised its peremptory challenges," the court found that "Petitioner fail[ed] to demonstrate purposeful discrimination on the basis that the race of prospective jurors was either circled, highlighted or otherwise noted on various lists." *Id.,* at 195. Thus, the court held that the *Batson* claim was "without merit." App. 196.

Foster subsequently sought review of the Superior Court's decision in the Georgia Supreme Court, but that court refused to issue a certificate of probable cause (CPC)

to appeal. In its entirety, the State Supreme Court order states:

> "Upon consideration of the Application for Certificate of Probable Cause to appeal the denial of habeas corpus, it is ordered that it be hereby denied. All the Justices concur, except Benham, J., who dissents." *Id.,* at 246.

Foster sought review of this decision, and this Court granted certiorari to review the decision of the Georgia Supreme Court. 575 U. S. ___ (2015).

## II

The decision of the Georgia Supreme Court was a decision on the merits of Foster's *Batson* claim, as presented in his state habeas petition. See Ga. Sup. Ct. Rule 36 (2016) (a CPC to appeal a final judgment in a habeas corpus case involving a criminal conviction "will be issued where there is arguable merit"); *Hittson* v. *Warden,* 759 F. 3d 1210, 1232 (CA11 2014) (The Georgia Supreme Court's standard for denying a CPC "clearly constitutes an adjudication on the merits"). Thus, what the Georgia Supreme Court held was that Foster's *Batson* claim, as presented in his state habeas petition, lacked arguable merit.

That holding was likely based at least in part on state law. As noted, the Superior Court quite clearly held that Foster's *Batson* claim was barred by res judicata. That conclusion, to be sure, was not entirely divorced from the merits of his federal constitutional claim, since the court went on to discuss the evidence advanced by petitioner in support of his argument that the prosecution's strikes of black members of the venire were based on race. Rather, it appears that the Superior Court understood state law to permit Foster to obtain reconsideration of his previously rejected *Batson* claim only if he was able to show that a "change in the facts" was "sufficient to overcome the res

judicata bar." App. 192.

In concluding that Foster's renewed *Batson* claim was required to meet a heightened standard, the Superior Court appears to have been following established Georgia law. Some Georgia cases seem to stand for the proposition that the bar is absolute, at least in some circumstances. See, *e.g., Roulain* v. *Martin*, 266 Ga. 353, 466 S. E. 2d 837, 839 (1996) ("Since this issue was raised and resolved in Martin's direct appeal, it should not have been read-dressed by the habeas court"); *Davis* v. *Thomas*, 261 Ga. 687, 689, 410 S. E. 2d 110, 112 (1991) ("This issue was raised on direct appeal, and this court determined that it had no merit. Davis recognizes the principle that one who had an issue decided adversely to him on direct appeal is precluded from relitigating that issue on habeas corpus"); *Gunter* v. *Hickman*, 256 Ga. 315, 316, 348 S. E. 2d 644, 645 (1986) ("This issue was actually litigated, i.e., raised and decided, in the appellant's direct appeal . . . . For this reason, the issue cannot be reasserted in habeas-corpus proceedings"); *Elrod* v. *Ault*, 231 Ga. 750, 204 S. E. 2d 176 (1974) ("After an appellate review the same issues will not be reviewed on habeas corpus"). Other decisions, however, allow a defendant to overcome res judicata if he can produce newly discovered evidence that was not "reasonably available" to him on direct review. *Gibson* v. *Head*, 282 Ga. 156, 159, 646 S. E. 2d 257, 260 (2007); see also *Gibson* v. *Ricketts*, 244 Ga. 482, 483, 260 S. E. 2d 877, 878 (1979).[4]

---

[4] Georgia res judicata law may also include a "miscarriage of justice" exception, but that appears to capture only the exceptionally rare claim of actual innocence, and so is not at issue here. See *Walker* v. *Penn*, 271 Ga. 609, 611, 523 S. E. 2d 325, 327 (1999) ("The term miscarriage of justice is by no means to be deemed synonymous with procedural irregularity, or even with reversible error. To the contrary, it demands a much greater substance, approaching perhaps the imprisonment of one who, not only is *not* guilty of the specific offense for which he is convicted, but, further, is not even culpable in the circumstances under inquiry. (A plain example is a case of mistaken identity)" (brackets omitted)).

In restricting the relitigation of previously rejected claims, Georgia is not alone. "[W]e have long and consistently affirmed that a collateral challenge may not do service for an appeal." *United States* v. *Frady*, 456 U. S. 152, 165 (1982). Accordingly, at least as a general rule, federal prisoners may not use a motion under 28 U. S. C. §2255 to relitigate a claim that was previously rejected on direct appeal. See, *e.g., Reed* v. *Farley*, 512 U. S. 339, 358 (1994) (Scalia, J., concurring in part and concurring in judgment) ("[C]laims will ordinarily not be entertained under §2255 that have already been rejected on direct review"); *Withrow* v. *Williams*, 507 U. S. 680, 721 (1993) (Scalia, J., concurring in part and dissenting in part) ("[A]bsent countervailing considerations, district courts may refuse to reach the merits of a constitutional claim previously raised and rejected on direct appeal"); *United States* v. *Lee*, 715 F. 3d 215, 224 (CA8 2013); *Rozier* v. *United States*, 701 F. 3d 681, 684 (CA11 2012); *United States* v. *Roane*, 378 F. 3d 382, 396, n. 7 (CA4 2004); *United States* v. *Webster*, 392 F. 3d 787, 791 (CA5 2004); *White* v. *United States*, 371 F. 3d 900, 902 (CA7 2004); *United States* v. *Jones*, 918 F. 2d 9, 10–11 (CA2 1990); *United States* v. *Prichard*, 875 F. 2d 789, 790–791 (CA10 1989). Cf. *Davis* v. *United States*, 417 U. S. 333, 342 (1974). As we have said, "[i]t has, of course, long been settled law that an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment. The reasons for narrowly limiting the grounds for collateral attack on final judgments are well known and basic to our adversary system of justice." *United States* v. *Addonizio*, 442 U. S. 178, 184 (1979) (footnote omitted).

In accordance with this principle, federal law provides that a state prisoner may not relitigate a claim that was rejected in a prior federal habeas petition. See 28 U. S. C. §§2244(b)(1)–(3). And even when a state prisoner's second

or successive federal habeas petition asserts a new federal constitutional claim based on what is asserted to be new evidence, the claim must be dismissed unless a very demanding test is met. See §2244(b)(2)(B) ("[T]he factual predicate for the claim could not have been discovered previously through the exercise of due diligence"; and the facts must "be sufficient to establish by clear and convincing evidence that . . . no reasonable factfinder would have found the applicant guilty").

"[T]he principle of finality" is "essential to the operation of our criminal justice system." *Teague* v. *Lane*, 489 U. S. 288, 309 (1989) (plurality opinion). Thus, once a criminal conviction becomes final—as Foster's did 30 years ago— state courts need not remain open indefinitely to relitigate claims related to that conviction which were raised and decided on direct review. States are under no obligation to permit collateral attacks on convictions that have become final, and if they allow such attacks, they are free to limit the circumstances in which claims may be relitigated.

To the extent that the decision of the Georgia Supreme Court was based on a state rule restricting the relitigation of previously rejected claims, the decision has a state-law component, and we have no jurisdiction to review a state court's decision on a question of state law. See 28 U. S. C. §1257(a). This Court, no less than every other federal court, has "an independent obligation to ensure that [we] do not exceed the scope of [our] jurisdiction, and therefore [we] must raise and decide jurisdictional questions that the parties either overlook or elect not to press." *Henderson* v. *Shinseki*, 562 U. S. 428, 434 (2011).

## III

"This Court long has held that it will not consider an issue of federal law on direct review from a judgment of a state court if that judgment rests on a state-law ground that is both 'independent' of the merits of the federal claim

and an 'adequate' basis for the court's decision," *Harris* v.
*Reed,* 489 U. S. 255, 260 (1989), and like the Court (and
both petitioner and respondent) I agree that we cannot
conclude from the brief order issued by the Supreme Court
of Georgia that its decision was based wholly on state law.
It is entirely possible that the State Supreme Court
reached a conclusion about the effect of the state res judi-
cata bar based in part on as assessment of the strength of
Foster's *Batson* claim or the extent to which the new
evidence bolstered that claim.  And if that is what the
State Supreme Court held, the rule that the court applied
was an amalgam of state and federal law.

By the same token, however, the state-law res judicata
rule applied by the Superior Court is clearly not like the
rule in *Ake* v. *Oklahoma*, 470 U. S. 68 (1985), which ap-
pears to have been entirely dependent on federal law.  In
*Ake*, a prisoner argued that due process entitled him to
obtain the services of a psychiatrist in order to prove that
he was insane at the time when he committed a murder.
The Oklahoma courts concluded that *Ake*'s claim was
waived, but the Oklahoma waiver rule essentially made
an exception for any case in which there was a violation of
a fundamental federal constitutional right.  See *id.*, at 74–
75 ("The Oklahoma waiver rule does not apply to funda-
mental trial error," including "federal constitutional errors
[that] are 'fundamental'").  Thus, the state waiver rule
was entirely dependent on federal law, and this Court
therefore held that it had jurisdiction to review the under-
lying constitutional question—whether Ake was entitled
to a psychiatrist.   Then, having found a constitu-
tional violation, the Court remanded for a new trial.  *Id.*,
at 86–87.

The res judicata rule applied by the Superior Court in
this case is quite different.  That court obviously did not
think that Georgia law included an *Ake*-like exception that
would permit a defendant to overcome res judicata simply

by making the kind of showing of federal constitutional error that would have been sufficient when the claim was first adjudicated. Accordingly, *Ake* does not mean that we can simply disregard the possibility that the decision under review may have a state-law component.

Our cases chart the path that we must follow in a situation like the one present here. When "a state court's interpretation of state law has been influenced by an accompanying interpretation of federal law," the proper course is for this Court to "revie[w] the federal question on which the state-law determination appears to have been premised. If the state court has proceeded on an incorrect perception of federal law, it has been this Court's practice to vacate the judgment of the state court and remand the case so that the court may reconsider the state-law question free of misapprehensions about the scope of federal law." *Three Affiliated Tribes of Fort Berthold Reservation* v. *Wold Engineering, P. C.*, 467 U. S. 138, 152 (1984). See also S. Shapiro, K. Geller, T. Bishop, E. Hartnett, & D. Himmelfarb, Supreme Court Practice 212 (10th ed. 2013). In a situation like the one presented here, the correct approach is for us to decide the question of federal law and then to remand the case to the state court so that it can reassess its decision on the state-law question in light of our decision on the underlying federal issue.[5]

## IV

I agree with the Court that the totality of the evidence now adduced by Foster is sufficient to make out a *Batson* violation. On remand, the Georgia Supreme Court is

_____

[5] The Court relies on *Ake* solely for the proposition, with which I agree, that we have jurisdiction to review the federal question whether the totality of the circumstances (that is, all the facts brought to the attention of the state courts on direct appeal and collateral review) make out a *Batson* claim. *Ante*, at 9, n. 4. Thus, the Court does not preclude consideration of state law issues on remand. See *ante*, at 25.

bound to accept that evaluation of the federal question, but whether that conclusion justifies relief under state res judicata law is a matter for that court to decide.

Compliance with *Batson* is essential to ensure that defendants receive a fair trial and to preserve the public confidence upon which our system of criminal justice depends. But it is also important that this Court respect the authority of state courts to structure their systems of postconviction review in a way that promotes the expeditious and definitive disposition of claims of error.

Until recently, this Court rarely granted review of state-court decisions in collateral review proceedings, preferring to allow the claims adjudicated in such proceedings to be decided first in federal habeas proceedings. See *Lawrence* v. *Florida*, 549 U. S. 327, 335 (2007) ("[T]his Court rarely grants review at this stage of the litigation even when the application for state collateral relief is supported by arguably meritorious federal constitutional claims, choosing instead to wait for federal habeas proceedings" (internal quotation marks omitted)); *Kyles* v. *Whitley*, 498 U. S. 931, 932 (1990) (Stevens, J., concurring in denial of stay of execution); *Huffman* v. *Florida*, 435 U. S. 1014, 1017–1018 (1978) (Stevens, J., respecting denial of certiorari). When cases reach this Court after habeas review in the lower federal courts, the standards of review set out in the Antiterrorism and Effective Death Penalty Act of 1996, 28 U. S. C. §2254, apply. Recently, this Court has evidenced a predilection for granting review of state-court decisions denying postconviction relief, see, *e.g., Wearry* v. *Cain*, 577 U. S. __ (2016) (*per curiam*). Particularly in light of that trend, it is important that we do not lightly brush aside the States' legitimate interest in structuring their systems of postconviction review in a way that militates against repetitive litigation and endless delay.

# SUPREME COURT OF THE UNITED STATES

―――――――

No. 14–8349

―――――――

## TIMOTHY TYRONE FOSTER, PETITIONER *v.* BRUCE CHATMAN, WARDEN

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF GEORGIA

[May 23, 2016]

JUSTICE THOMAS, dissenting.

Thirty years ago, Timothy Foster confessed to murdering Queen Madge White after sexually assaulting her with a bottle of salad dressing. In the decades since, Foster has sought to vacate his conviction and death sentence on the ground that prosecutors violated *Batson* v. *Kentucky*, 476 U. S. 79 (1986), when they struck all black prospective jurors before his trial. Time and again, the state courts have rejected that claim. The trial court twice rejected it, and the Supreme Court of Georgia unequivocally rejected it when Foster directly appealed his conviction and sentence. *Foster* v. *State*, 258 Ga. 736, 736, n. 1, 738–739, 374 S. E. 2d 188, 190, n. 1, 192 (1988), cert. denied, 490 U. S. 1085 (1989). A state habeas court rejected it in 2013. App. 175–176, 192–196. And most recently, the Supreme Court of Georgia again rejected it as lacking "arguable merit," Ga. Sup. Ct. Rule 36 (2001). See App. 246.

Yet, today—nearly three decades removed from *voir dire*—the Court rules in Foster's favor. It does so without adequately grappling with the possibility that we lack jurisdiction. Moreover, the Court's ruling on the merits, based, in part, on new evidence that Foster procured decades after his conviction, distorts the deferential *Batson* inquiry. I respectfully dissent.

## I

Federal law authorizes us to review the "judgments or decrees rendered by the highest court of a State in which a decision could be had," 28 U. S. C. §1257(a), but only if such a judgment or decree raises a question of federal law, *Michigan* v. *Long*, 463 U. S. 1032, 1038 (1983). The Court today errs by assuming that the Supreme Court of Georgia's one-line order—the "judgmen[t] . . . rendered by the highest court of a State in which a decision could be had," §1257—raises such a question. See *ante,* at 7–8. The far more likely explanation for the court's denial of habeas relief is that Foster's claim is procedurally barred. This disposition is ordinarily a question of state law that this Court is powerless to review. Before addressing the merits of Foster's *Batson* claim, the Court should have sought clarification that the resolution of a federal question was implicated in the Georgia high court's decision.

## A

The Supreme Court of Georgia's order in this case states in full: "Upon consideration of the Application for Certificate of Probable Cause to appeal the denial of habeas corpus, it is ordered that it be hereby denied." App. 246. Neither that order nor Georgia law provides adequate assurance that this case raises a federal question.

Under Georgia law, a state prisoner may file a state habeas petition in a state superior court. Ga. Code Ann. §§9–14–41 to 9–14–43 (2015). If the state superior court denies the petition, then the prisoner may appeal to the Supreme Court of Georgia, which has exclusive jurisdiction over habeas corpus cases, by timely filing a notice of appeal in the superior court and applying for a certificate of probable cause in the supreme court. See *Fullwood* v. *Sivley*, 271 Ga. 248, 250–251, 517 S. E. 2d 511, 513–515 (1999) (discussing requirements of §9–14–52). Much like certificates of appealability in federal court, *Miller-El* v.

*Cockrell*, 537 U. S. 322, 336 (2003), a Georgia prisoner must establish in his application that at least one of his claims has "arguable merit." Ga. Sup. Ct. Rule 36. If he cannot, the Supreme Court of Georgia summarily denies relief by denying the certificate of probable cause. *Ibid.*; see also §9–14–52(b); *Hittson* v. *GDCP Warden*, 759 F. 3d 1210, 1231–1232 (CA11 2014). If he can, then the court affords plenary review of the arguably meritorious claim. See, *e.g.*, *Sears* v. *Humphrey*, 294 Ga. 117, 117–118, 751 S. E. 2d 365, 368 (2013); *Hillman* v. *Johnson*, 297 Ga. 609, 611, 615, n. 5, 774 S. E. 2d 615, 617, 620, n. 5 (2015). The most we can glean, therefore, from the summary denial of Foster's state habeas petition is that the Supreme Court of Georgia concluded that Foster's claim lacked "arguable merit."

The most obvious ground for deciding that Foster's claim lacked "arguable merit" is that the Supreme Court of Georgia already considered that claim and rejected it decades ago.[1] Georgia law prohibits Foster from raising the same claim anew in his state habeas petition. See,

——————

[1] That is obvious, in part, because the Superior Court rested on this procedural bar to deny Foster's *Batson* claim. See, *e.g.,* App. 175–176. We need not blind ourselves to that lurking state-law ground merely because the Supreme Court of Georgia denied relief in an unexplained order. As we would do in the federal habeas context, we may "look through" to the last reasoned state-court opinion to discern whether that opinion rested on state-law procedural grounds. *Ylst* v. *Nunnemaker*, 501 U. S. 797, 806 (1991). If "the last reasoned opinion on the claim explicitly imposes a procedural default," then there is a rebuttable presumption "that a later decision rejecting the claim did not silently disregard that bar and consider the merits." *Id.,* at 803; see also, *e.g., Kernan* v. *Hinojosa*, *ante*, at 3 (*per curiam*). We presume, in other words, that the decision rests on a question of state law. That presumption arguably plays an even more important role in a state-court case like this, where a state-law procedural defect would oust this Court of its jurisdiction. See *Coleman* v. *Thompson*, 501 U. S. 722, 730 (1991) (distinguishing a state-law procedural bar's effect on a state case from its effect in federal habeas).

*e.g., Davis* v. *Thomas*, 261 Ga. 687, 689, 410 S. E. 2d 110,
112 (1991). "It is axiomatic" in the Georgia courts "that a
habeas court is not to be used as a substitute for an ap-
peal, or as a second appeal." *Walker* v. *Penn*, 271 Ga. 609,
612, 523 S. E. 2d 325, 327 (1999). Without such proce-
dural bars, state prisoners could raise old claims again and
again until they are declared victorious, and finality would
mean nothing. See Friendly, Is Innocence Irrelevant?
Collateral Attack on Criminal Judgments, 38 U. Chi.
L. Rev. 142, 145 (1970) ("The proverbial man from Mars
would surely think we must consider our system of crimi-
nal justice terribly bad if we are willing to tolerate such
efforts at undoing judgments of conviction").

I would think that this state-law defect in Foster's state
habeas petition would be the end of the matter: "Because
this Court has no power to review a state law determina-
tion that is sufficient to support the judgment, resolution
of any independent federal ground for the decision could
not affect the judgment and would therefore be advisory."
*Coleman* v. *Thompson*, 501 U. S. 722, 729 (1991). It is
fundamental that this Court's "only power over state
judgments is to correct them to the extent that they incor-
rectly adjudge federal rights." *Herb* v. *Pitcairn*, 324 U. S.
117, 125–126 (1945). If an adequate and independent
state-law ground bars Foster's claim, then the Court today
has done nothing more than issue an impermissible advi-
sory opinion.

B

To assure itself of jurisdiction, the Court wrongly as-
sumes that the one-line order before us implicates a federal
question. See *ante,* at 7–8. The lurking state-law proce-
dural bar, according to the Court, is not an *independent*
state-law ground because it "depends on a federal consti-
tutional ruling." *Ante,* at 7 (internal quotation marks
omitted).

I would not so hastily assume that the State Supreme Court's unelaborated order depends on the resolution of a federal question without first seeking clarification from the Supreme Court of Georgia. To be sure, we often presume that a "state court decide[s] the case the way it did because it believed that federal law required it to do so." *Long*, 463 U. S., at 1040–1041. But there still exist "certain circumstances in which clarification [from the state court] is necessary or desirable" before delving into the merits of a state court's decision. *Id.,* at 1041, n. 6.

This case presents such a circumstance. The *Long* presumption assumes that the ambiguous state-court ruling will come in the form of a reasoned decision: It applies in cases in which "it is not clear from the *opinion itself* that the state court relied upon an adequate and independent state ground and when it *fairly appears* that the state court rested its decision primarily on federal law." *Id.,* at 1042 (emphasis added). But here, when the decision is a one-line judgment, it hardly makes sense to invoke the *Long* presumption. There is neither an "opinion" nor any resolution of federal law that "fairly appears" on the face of the unexplained order. *Ibid.*

Confronted with cases like this in the past, this Court has vacated and remanded for clarification from the state court before proceeding to decide the merits of the underlying claim. I would follow that path instead of assuming that the one-line order implicates a federal question. We have "decline[d] . . . to review the federal questions asserted to be present" when "'there is considerable uncertainty as to the precise grounds for the [state court's] decision.'" *Bush* v. *Palm Beach County Canvassing Bd.*, 531 U. S. 70, 78 (2000) (*per curiam*) (quoting *Minnesota* v. *National Tea Co.*, 309 U. S. 551, 555 (1940)). *A fortiori*, when a State's highest court has denied relief without any explanation, the proper course is to vacate and remand for clarification before reaching the merits of a federal question that might

have nothing to do with the state court's decision. See, *e.g., Capital Cities Media, Inc.* v. *Toole*, 466 U. S. 378 (1984) (*per curiam*); see also, *e.g., Johnson* v. *Risk*, 137 U. S. 300, 306–307 (1890). This course respects weighty federalism concerns. "It is fundamental that state courts be left free and unfettered by us" in interpreting their own law, *National Tea Co., supra*, at 557, especially when a state prisoner's long-final conviction is at stake.

Clarification is especially warranted here. Nothing in the reported decisions of the Supreme Court of Georgia suggests that federal law figures in how Georgia applies its res judicata procedural bar. Those decisions state that "new law or new facts" could "justify the reconsideration of the claims . . . raised on direct appeal," *Hall* v. *Lance*, 286 Ga. 365, 376–377, 687 S. E. 2d 809, 818 (2010), as might a showing that the prisoner is actually innocent, *Walker*, *supra*, at 611, 523 S. E. 2d, at 327. But it is for the Supreme Court of Georgia—not this Court—to decide what new facts suffice to reopen a claim already decided against a state habeas petitioner. It is up to the Georgia courts, for example, to decide whether a petitioner was diligent in discovering those new facts, see, *e.g., Gibson* v. *Head*, 282 Ga. 156, 159, 646 S. E. 2d 257, 260 (2007) (noting that whether a petitioner could overcome the procedural bar "depend[ed] on factual findings" including "the precise timing of [his] discovery of" the new evidence), or whether the new facts are "material," *Rollf* v. *Carter*, 298 Ga. 557, 558, ___ S. E. 2d ___, ___ (2016).

Instead of leaving the application of Georgia law to the Georgia courts, the Court takes it upon itself to decide that the procedural bar implicates a federal question. Worse still, the Court surmises that Georgia's procedural bar depends on the resolution of a federal question by parsing the wrong court's decision, the opinion of the Superior Court of Butts County. *Ante,* at 7–8. Invoking *Ake* v. *Oklahoma*, 470 U. S. 68, 75 (1985), the Court rea-

sons that "*the state habeas court's* application of res judicata to Foster's *Batson* claim was not independent of the merits of his federal constitutional challenge." *Ante,* at 8. (emphasis added). Accordingly, whether Foster has alleged a sufficient "'change in the facts'" to overcome the Georgia procedural bar depends on whether Foster's *Batson* claim would succeed in light of those changed facts. *Ante,* at 7–8. But the State Superior Court's opinion is not the "judgmen[t] . . . by the highest court of [Georgia] in which a decision could be had" subject to our certiorari jurisdiction. 28 U. S. C. §1257. The unexplained denial of relief by the Supreme Court of Georgia is.

I cannot go along with the Court's decision to assure itself of its jurisdiction by attributing snippets of the State Superior Court's reasoning to the Supreme Court of Georgia. The reported decisions of the Supreme Court of Georgia do not resolve what "type of new alleged facts . . . could ever warrant setting aside the procedural bar," *Hall, supra,* at 377, 687 S. E. 2d, at 818, let alone intimate that a prisoner may relitigate a claim already decided against him merely because he might win this second time around. Cf. *Roulain* v. *Martin*, 266 Ga. 353, 354, 466 S. E. 2d 837, 839 (1996) (opining that a state habeas court "would certainly be bound by the ruling [in the petitioner's direct appeal] regardless of whether that ruling may be erroneous"). I therefore refuse to presume that the unexplained denial of relief by the Supreme Court of Georgia presents a federal question.[2]

———————

[2] The Court takes me to task for not "follow[ing my] own rule," *ante,* at 8–9, n. 3, because I acknowledge that the State Superior Court's decision is strong evidence that Foster's claim was denied as procedurally defaulted. See *supra,* at 3–4, and n. 1. It is one thing to look to the reasoning of a lower state court's decision to confirm that the Court *lacks* jurisdiction. It is quite another for the Court to probe that lower state court's decision to *assure* itself of jurisdiction. The Court reads the tea leaves of a single State Superior Court's decision to decide that

The Court today imposes an opinion-writing require-
ment on the States' highest courts.  Lest those high courts
be subject to lengthy digressions on constitutional claims
that might (or might not) be at issue, they must offer
reasoned opinions why—after rejecting the same claim
decades ago—they refuse to grant habeas relief now.  But
"[o]pinion-writing practices in state courts are influenced
by considerations other than avoiding scrutiny by collat-
eral attack in federal court," including "concentrat[ing
their] resources on the cases where opinions are most
needed."  *Harrington* v. *Richter*, 562 U. S. 86, 99 (2011).
Rather than demand detailed opinions of overburdened
state courts, the Court should vacate and remand cases
such as this one to assure itself of its jurisdiction.

## II

The Court further errs by deciding that Foster's *Batson*
claim has arguable merit.  Because the adjudication of his
*Batson* claim is, at bottom, a credibility determination, we
owe "great deference" to the state court's initial finding
that the prosecution's race-neutral reasons for striking
veniremen Eddie Hood and Marilyn Garrett were credible.
*Batson*, 476 U. S., at 98, n. 21.  On a record far less cold
than today's, the Supreme Court of Georgia long ago (on
direct appeal) rejected that claim by giving great deference
to the trial court's credibility determinations.  Evaluating
the strike of venireman Hood, the court highlighted that
his son had been convicted of a misdemeanor and that

---

the state-law procedural bar depends on the resolution of a federal
question.  That is a question of Georgia law that is best answered by
the decisions of the Supreme Court of Georgia.  See *Commissioner* v.
*Estate of Bosch*, 387 U. S. 456, 465 (1967) (concluding that when "the
underlying substantive rule involved is based on state law," "the State's
highest court is the best authority on its own law"); cf. *King* v. *Order of
United Commercial Travelers of America*, 333 U. S. 153, 160–162 (1948)
(rejecting an unreported state trial court decision as binding under *Erie
R. Co.* v. *Tompkins*, 304 U. S. 64 (1938)).

both his demeanor and religious affiliation indicated that he might be reluctant to impose the death penalty. *Foster*, 258 Ga., at 738, 374 S. E. 2d, at 192. And the prosecution reasonably struck venireman Garrett, according to the court, because it feared that she would sympathize with Foster given her work with "low-income, underprivileged children" and because she was "related to someone with a drug or alcohol problem." *Id.,* at 739, 374 S. E. 2d, at 192. That should have been the last word on Foster's *Batson* claim.

But now, Foster has access to the prosecution's file. By allowing Foster to relitigate his *Batson* claim by bringing this newly discovered evidence to the fore, the Court upends *Batson*'s deferential framework. Foster's new evidence does not justify this Court's reassessment of who was telling the truth nearly three decades removed from *voir dire*.

## A

The new evidence sets the tone for the Court's analysis, but a closer look reveals that it has limited probative value. For this reason, the Court's conclusion that the prosecution violated *Batson* rests mostly on arguments at Foster's disposal decades ago. See *ante,* at 14–16 (concluding that trial transcripts belie proffered reasons for striking Garrett); *ante,* at 17–22 (relying on transcripts and briefs as evidence of the prosecution's shifting explanations for striking Hood). The new evidence is no excuse for the Court's reversal of the state court's credibility determinations.

As even the Court admits, *ante,* at 9–10, we do not know who wrote most of the notes that Foster now relies upon as proof of the prosecutors' race-based motivations. We do know, however, that both prosecutors averred that they "did not make any of the highlighted marks on the jury venire list" and "did not instruct anyone to make the green

highlighted marks." App. 168–169, 171. In particular, prosecutor Stephen Lanier reaffirmed his earlier testimony, given during Foster's hearing for a new trial, that he relied only on race-neutral factors in striking the jury. *Id.*, at 169; see also *id.*, at 80–125. And, prosecutor Douglas Pullen swore that he "did not rely on the highlighted jury venire list." *Id.*, at 171.

The hazy recollections of the prosecution's investigator, Clayton Lundy, are not to the contrary. As part of the postconviction proceedings, Lundy testified that he "[v]aguely" remembered parts of jury selection, he "kind of remember[ed]" some of the documents used during jury selection, and cautioned that he "ain't done this in a long time." Tr. 181–182. (When Lundy testified in 2006, nearly 20 years had passed since Foster's trial and he had changed careers. *Id.*, at 174.) He thought others at the district attorney's office "probably" passed venire lists around the office and "guess[ed]" that everyone would make notations. *Id.*, at 182, 190.

As for the other documents in the prosecution's file, Lundy could not identify who authored any of them, with two exceptions.[3] First, Lundy said he prepared handwritten lists describing seven veniremen, including Garrett, but her race is not mentioned. See *id.*, at 205; App. 293–294. Second, Lundy "guess[ed]" that prosecutor Lanier suggested the handwritten edits to a draft of an affidavit that Lundy later submitted to the trial court. Tr. 203; see App. 343–347 (draft affidavit); *id.*, at 127–129 (final affi-

_____

[3]At oral argument, counsel for Georgia also stipulated that "one of the two prosecutors" must have drafted another document comprising a "definite NO's" list and a "questionables" list of veniremen. Tr. of Oral Arg. 45; App. 301. Both veniremen Hood and Garrett appeared on the "definite NO's" list. Of course we cannot know when these lists were created, or whether Lanier himself relied upon them. See Tr. of Oral Arg. 45 (calling into question whether Lanier's "thought process" was based on those lists).

davit). The relevant edits suggested deleting two statements that, "*solely* [*in Lundy's*] *opinion*," prosecutors ought to pick Garrett "[i]f it comes down to having to pick one of the black jurors." *Id.*, at 345 (emphasis added). Perhaps this look inside the district attorney's office reveals that the office debated internally who would be the best black juror. Or perhaps it reveals only Lundy's personal thoughts about selecting black jurors, an "opinion" with which (we can "guess") Lanier disagreed.

The notion that this "newly discovered evidence" could warrant relitigation of a *Batson* claim is flabbergasting. In *Batson* cases, the "decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Hernandez* v. *New York*, 500 U. S. 352, 365 (1991) (plurality opinion). And because "[t]here will seldom be much evidence bearing on that issue," "the best evidence often will be the demeanor of the attorney who exercises the challenge." *Ibid.* Time and again, we have said that the credibility of the attorney is best judged by the trial court and can be overturned only if it is clearly erroneous. See *ibid.*; see also *Snyder* v. *Louisiana*, 552 U. S. 472, 477 (2008); *Miller-El*, 537 U. S., at 339; *Hernandez*, *supra,* at 375 (O'Connor, J., concurring in judgment).

But the Court today invites state prisoners to go searching for new "evidence" by demanding the files of the prosecutors who long ago convicted them. If those prisoners succeed, then apparently this Court's doors are open to conduct the credibility determination anew. Alas, "every end is instead a new beginning" for a majority of this Court. *Welch* v. *United States*, *ante,* at 15 (THOMAS, J., dissenting). I cannot go along with that "sort of sandbagging of state courts." *Miller-El* v. *Dretke*, 545 U. S. 231, 279 (2005) (THOMAS, J., dissenting). New evidence should not justify the relitigation of *Batson* claims.

B

Perhaps the Court's decision to reconsider a decades-old *Batson* claim based on newly discovered evidence would be less alarming if the new evidence revealed that the trial court had misjudged the prosecutors' reasons for striking Garrett and Hood. It does not. Not only is the probative value of the evidence severely limited, *supra,* at 8–11, but also pieces of the new evidence corroborate the trial court's conclusion that the race-neutral reasons were valid. The Court's substitution of its judgment for the trial court's credibility determinations is flawed both as a legal and factual matter.

1

The Court's analysis with respect to Hood is unavailing. The Court first compares Hood with other jurors who had similarly aged children, *ante,* at 18–19, just as the trial court did decades ago, App. 135–136. The trial court was well aware that Hood's son's conviction was for theft, not murder. But in the words of the trial court, "the conviction is a distinction that makes the difference" between Hood and the other jurors, and the prosecution's "apprehension that this would tend to, perhaps only subconsciously, make the venireman sympathetic to [Foster] was a rational one." *Ibid.* Because "the trial court believe[d] the prosecutor's nonracial justification, and that finding is not clearly erroneous, that [should be] the end of the matter." *Hernandez*, *supra,* at 375 (O'Connor, J., concurring in judgment).

The Court also second-guesses the prosecution's strike of Hood because of his questionable stance on the death penalty. The Court concludes that Hood's transcribed statements at *voir dire* "unequivocally voiced [Hood's] willingness to impose the death penalty." *Ante,* at 22. There is nothing unequivocal about a decades-old record. Our case law requires the Court to defer to the trial court's

finding that the State's race-neutral concerns about Hood's "soft-spoken[ness] and slow[ness] in responding to the death penalty questions" were "credible." App. 138; see *Snyder*, *supra,* at 477 ("[R]ace-neutral reasons for peremptory challenges often invoke a juror's demeanor (*e.g.,* nervousness, inattention), making the trial court's firsthand observations of even greater importance"). The "evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province." *Hernandez*, *supra,* at 365 (plurality opinion) (internal quotation marks omitted).

The new evidence, moreover, supports the prosecution's concern about Hood's views on capital punishment. A handwritten document in the prosecution's file stated that the Church of Christ "doesn't take a stand on [the] Death Penalty." App. 302. Perplexingly, the Court considers this proof that the prosecution misled the trial court about its reasons for striking Hood. *Ante,* at 20–21. Hardly. That document further states that capital punishment is an issue "left for each individual member," App. 302, and thus in no way discredits the prosecutor's statement that, in his experience, "Church of Christ people, while they may not take a formal stand against the death penalty, . . . are very, very reluctant to vote for the death penalty." *Id.*, at 84. And other notes in the file say that Hood gave "slow D[eath] P[enalty] answers" and that he "hesitated . . . when asked about [the] D[eath] P[enalty]." *Id.*, at 295, 303. This new evidence supports the prosecution's stated reason for striking Hood—that he, as a member of the Church of Christ, had taken an uncertain stance on capital punishment.

2

Likewise, the Court's evaluation of the strike of Garrett is riddled with error. The Court is vexed by a single misrepresentation about the prosecution's decision to strike

Garrett—the prosecution stated that Garrett was listed as "'questionable'" but the new evidence reveals that Garrett was on the "'definite NO's'" list from the beginning. *Ante,* at 13–14. But whether the prosecution planned to strike Garrett all along or only at the last minute seems irrelevant to the more than 10 race-neutral reasons the prosecution supplied for striking Garrett.

The prosecution feared that Garrett might sympathize with Foster at sentencing. She worked with disadvantaged children, she was young, and she failed to disclose that her cousin had been recently arrested. See App. 55–57, 105. And prosecutors were concerned that she gave short answers, appeared nervous, and did not ask to be off the jury even though she was a divorced mother of two children and worked more than 70 hours per week. See *id.,* at 55–56, 93–94. The prosecution also stated repeatedly that they were concerned about female jurors, who "appear to be more sympathetic . . . in . . . death penalty case[s] than men." *Id.*, at 42; see *id.,* at 57.[4]

Pieces of the new evidence support some of these concerns. The notes in the prosecutors' file reveal that someone on the prosecution team was aware that Garrett's cousin was Angela Garrett (who had been arrested for drug-related charges and fired from her job on the eve of trial, *id.*, at 105, 129), that Garrett "would not look a[t] [the] C[our]t during V[oir] D[ire]," that she gave "very short answers," and that she "[l]ooked @ floor during D[eath] P[enalty]" questioning. *Id.*, at 293, 308.

Nevertheless, the Court frets that these indisputably race-neutral reasons were pretextual. The Court engages in its own comparison of the jurors to highlight the prosecution's refusal to strike white jurors with similar charac-

––––––––
[4] This Court's decision in *J. E. B.* v. *Alabama ex rel. T. B.*, 511 U. S. 127 (1994), which held that peremptory strikes on the basis of sex were unconstitutional, postdated Foster's direct appeal.

teristics. *Ante,* at 14–16. But as with venireman Hood, the Georgia courts were faced with the same contentions regarding Garrett decades ago, and the Supreme Court of Georgia rightly decided that the trial court's findings were worthy of deference. After conducting a post-trial hearing in which one of the prosecutors testified, App. 80–125, the trial court credited the prosecution's concerns. The trial court, for example, agreed that Garrett's association with Head Start might be troubling and "believe[d] that the state [was] honest in voicing its concern that the combination of holding down two jobs and being the divorced mother of two indicates a less stable home environment," which "was the prime defense in [Foster's] case." *Id.,* at 142; see *id.,* at 141. Again, that should be "the end of the matter." *Hernandez,* 500 U. S*.,* at 375 (O'Connor, J., concurring in judgment).

\*     \*     \*

Today, without first seeking clarification from Georgia's highest court that it decided a federal question, the Court affords a death-row inmate another opportunity to relitigate his long-final conviction. In few other circumstances could I imagine the Court spilling so much ink over a factbound claim arising from a state postconviction proceeding. It was the trial court that observed the veniremen firsthand and heard them answer the prosecution's questions, and its evaluation of the prosecution's credibility on this point is certainly far better than this Court's nearly 30 years later. See *Hernandez, supra*, at 365 (plurality opinion). I respectfully dissent.