Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
02/22/2022 08:06 AM CST

State of Nebraska, appellee, v. Kwamayne
D. Jackson, appellant.

___ N.W.2d ___

Filed February 15, 2022.    No. A-20-934.

1. **Juries: Discrimination: Prosecuting Attorneys: Appeal and Error.**
   An appellate court reviews de novo the facial validity of an attorney's
   race-neutral explanation for using a peremptory challenge as a question
   of law. It reviews for clear error a trial court's factual determination
   regarding whether a prosecutor's race-neutral explanation is persuasive
   and whether the prosecutor's use of a peremptory challenge was pur-
   posefully discriminatory.
2. **Sentences: Appeal and Error.** An appellate court will not disturb a sen-
   tence imposed within the statutory limits absent an abuse of discretion
   by the trial court.
3. **Judgments: Words and Phrases.** Abuse of discretion occurs when a
   trial court's decision is based upon reasons that are untenable or unrea-
   sonable or if its action is clearly against justice or conscience, reason,
   and evidence.
4. **Appeal and Error.** An alleged error must be both specifically assigned
   and specifically argued in the brief of the party asserting the error to be
   considered by an appellate court.
5. **Juries: Discrimination: Prosecuting Attorneys: Equal Protection.** A
   prosecutor is ordinarily entitled to exercise permitted peremptory chal-
   lenges for any reason at all, if that reason is related to his or her view
   concerning the outcome of the case. However, the U.S. Supreme Court
   in *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69
   (1986), held that the Equal Protection Clause forbids the prosecutor
   from challenging jurors solely because of their race.
6. **Juries: Discrimination: Prosecuting Attorneys: Proof.** Determining
   whether a prosecutor impermissibly struck a prospective juror based
   on race is a three-step process. In this three-step process, the ultimate

burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.

7. **Juries: Discrimination: Prosecuting Attorneys: Appeal and Error.** Once the trial court has decided the ultimate question of intentional discrimination in a prosecutor's strike of a prospective juror, the questions on appeal are only whether the prosecutor's reasons were facially race neutral and whether the trial court's final determination regarding purposeful discrimination was clearly erroneous.

8. **Juries: Discrimination: Prosecuting Attorneys.** Whether a prosecutor's reasons for using peremptory challenges are race neutral is a question of law. A trial court's determination that the prosecutor's race-neutral explanation should be believed, on the other hand, frequently involves evaluation of a prosecutor's credibility, which requires deference to the court's findings absent exceptional circumstances.

9. ____: ____: ____. In determining whether a prosecutor's explanation for using a peremptory challenge is race neutral, a court is not required to reject an explanation because it is not persuasive, or even plausible; it is sufficient if the reason is not inherently discriminatory. Only inherently discriminatory explanations are facially invalid.

10. **Juries: Discrimination: Prosecuting Attorneys: Evidence.** Evidence that a prosecutor's reasons for striking a Black prospective juror apply equally to an otherwise similar non-Black prospective juror, who is allowed to serve, tends to suggest purposeful discrimination.

Appeal from the District Court for Douglas County: Timothy P. Burns, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, Mary Rose Donahue, and Mary M. Dvorak for appellant.

Douglas J. Peterson, Attorney General, and Siobhan E. Duffy for appellee.

Riedmann, Bishop, and Arterburn, Judges.

Bishop, Judge.

## I. INTRODUCTION

Following a jury trial, Kwamayne D. Jackson was convicted of child abuse resulting in serious bodily injury. The Douglas County District Court sentenced him to 14 to 18 years' imprisonment, with credit for 538 days already served. On appeal,

Jackson claims error regarding jury selection and sentencing. We affirm.

## II. BACKGROUND

In May 2019, Jackson was caring for a 3-month-old infant and her two siblings. The infant became unresponsive and was subsequently taken via ambulance to a hospital. She had no observed external injuries, but imaging showed she had a left-sided subdural hematoma, and she required surgery to relieve the pressure on her brain. It was also discovered that the infant's left eye had hemorrhages too numerous to count. A child abuse pediatrician diagnosed the infant with abusive head trauma and said her injuries were most likely the result of severe impact with or without shaking; it would have been "almost immediate from the time that she was injured to the time that she appeared unwell."

The State filed an information on July 26, 2019, and an amended information on September 17, 2020, charging Jackson with one count of child abuse resulting in serious bodily injury, a Class II felony, pursuant to Neb. Rev. Stat. § 28-707(1) and (7) (Reissue 2016).

A jury trial was held in September 2020. Voir dire was conducted with 34 potential jurors—4 were struck for cause. After the parties exercised their peremptory strikes, Jackson raised a challenge under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), because the State struck two of the three "African-American[s]" in the panel of prospective jurors. After hearing argument, the district court denied Jackson's *Batson* challenge. Trial proceeded on the merits of the case.

On September 23, 2020, the jury found Jackson guilty of knowing and intentional child abuse resulting in serious bodily injury, and the district court entered judgment on the conviction of the Class II felony. Following a hearing on December 1, the court sentenced Jackson to 14 to 18 years' imprisonment, with credit for 538 days already served.

Jackson appeals.

## III. ASSIGNMENTS OF ERROR

Jackson assigns that the district court erred when it (1) denied his *Batson* challenge and (2) failed to adequately consider mitigating factors at sentencing.

## IV. STANDARD OF REVIEW

[1] An appellate court reviews de novo the facial validity of an attorney's race-neutral explanation for using a peremptory challenge as a question of law. It reviews for clear error a trial court's factual determination regarding whether a prosecutor's race-neutral explanation is persuasive and whether the prosecutor's use of a peremptory challenge was purposefully discriminatory. *State v. Briggs*, 303 Neb. 352, 929 N.W.2d 65 (2019).

[2,3] An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020). Abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

## V. ANALYSIS

[4] We initially note that Jackson argued, but did not assign as error, that the evidence was insufficient to support his conviction. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court. *State v. Sundquist*, 301 Neb. 1006, 921 N.W.2d 131 (2019). Accordingly, we proceed to address only those errors both assigned and argued by Jackson.

### 1. *Batson* Challenge

Jackson argues that the district court committed reversible error by overruling his *Batson* challenge to the jury selection. He contends the State used peremptory challenges on

certain jurors solely because of their race, contrary to *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

### (a) Applicable Law

#### (i) General Propositions

[5] A prosecutor is ordinarily entitled to exercise permitted peremptory challenges for any reason at all, if that reason is related to his or her view concerning the outcome of the case. *State v. Wofford*, 298 Neb. 412, 904 N.W.2d 649 (2017). However, the U.S. Supreme Court in *Batson v. Kentucky, supra*, held that the Equal Protection Clause forbids the prosecutor from challenging jurors solely because of their race. *State v. Wofford, supra*.

[6] Determining whether a prosecutor impermissibly struck a prospective juror based on race is a three-step process. *State v. Briggs, supra*. See, also, *Batson v. Kentucky, supra*. In this three-step process, the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. *State v. Briggs, supra*. First, a defendant must make a prima facie showing that the prosecutor exercised a peremptory challenge because of race. Second, assuming the defendant made such a showing, the prosecutor must offer a race-neutral basis for striking the juror. And third, the trial court must determine whether the defendant has carried his or her burden of proving purposeful discrimination. *Id.*

[7,8] Once the trial court has decided the ultimate question of intentional discrimination, however, the questions on appeal are only whether the prosecutor's reasons were facially race neutral and whether the trial court's final determination regarding purposeful discrimination was clearly erroneous. *Id.* Whether a prosecutor's reasons for using peremptory challenges are race neutral is a question of law. *Id.* A trial court's determination that the prosecutor's race-neutral explanation should be believed, on the other hand, frequently involves evaluation

of a prosecutor's credibility, which requires deference to the court's findings absent exceptional circumstances. *Id.*

[9] In determining whether a prosecutor's explanation for using a peremptory challenge is race neutral, a court is not required to reject an explanation because it is not persuasive, or even plausible; it is sufficient if the reason is not inherently discriminatory. *Id*. Only inherently discriminatory explanations are facially invalid. *State v. Wofford, supra*.

[10] Evidence that a prosecutor's reasons for striking a Black prospective juror apply equally to an otherwise similar non-Black prospective juror, who is allowed to serve, tends to suggest purposeful discrimination. *Foster v. Chatman*, 578 U.S. 488, 136 S. Ct. 1737, 195 L. Ed. 2d 1 (2016).

### (ii) Summary of Foster v. Chatman

In his brief on appeal, Jackson refers us to the successful *Batson* challenge in *Foster v. Chatman, supra*. However, there is a significant difference in the substance of the record produced in *Foster v. Chatman* and the record before this court. The record ultimately produced in *Foster v. Chatman* revealed that the prosecution's file, obtained by a series of requests under Georgia's public records act, "plainly belie[d] the State's claim that it exercised its strikes in a 'color-blind' manner." *Foster v. Chatman*, 578 U.S. at 513. "[T]he focus on race in the prosecution's file plainly demonstrates a concerted effort to keep black prospective jurors off the jury." *Id*., 578 U.S. at 514.

Notably in *Foster*, during jury selection at the defendant's trial, the State exercised peremptory strikes to remove all four Black prospective jurors qualified to serve. The defendant lodged a *Batson* challenge. The trial court rejected the objection and impaneled the jury. The jury convicted the defendant in *Foster* and sentenced him to death. When ultimately granted certiorari by the U.S. Supreme Court in a subsequent habeas corpus action, the record contained: copies of jury venire lists with the names of Black prospective jurors highlighted in

bright green; an affidavit prepared by an investigator assisting the prosecution in jury selection, which affidavit detailed the investigator's views on 10 Black prospective jurors and noted which juror should be selected if the prosecution "'had to pick a black juror'"; a handwritten document titled "'definite NO's,'" listing six names, the first five of which were qualified Black prospective jurors; a handwritten document titled "'Church of Christ,'" and a notation on the document which read: "NO. No <u>Black</u> Church'"; and questionnaires completed by several of the Black prospective jurors, on which questionnaires each juror noted his or her race. *Foster v. Chatman*, 578 U.S. at 494, 495.

Since both parties agreed the defendant in *Foster* demonstrated a prima facie showing that the prosecutor exercised a peremptory challenge because of race and that the prosecutor offered race-neutral reasons for the strikes, the Court addressed only the third step of the process outlined in *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), which step was whether the defendant had shown purposeful discrimination. The Court stated, "That step turns on factual determinations, and, 'in the absence of exceptional circumstances,' we defer to state court factual findings unless we conclude that they are clearly erroneous." *Foster v. Chatman*, 578 U.S. at 500.

The Court noted that a struck juror's name appeared on the "'definite NO's'" list in the prosecution's file and that this belied the district attorney's assertion that the State considered allowing that juror to serve. Also, several of the district attorney's reasons for why he struck a Black prospective juror over a non-Black prospective juror were similarly contradicted by the record; for example, the district attorney told the court that he struck a certain Black prospective juror because the defense did not ask her questions about pertinent trial issues, but the trial transcripts revealed that the defense asked several questions on the topics. "[O]ther explanations given by the prosecution, while not explicitly contradicted by the record, are

difficult to credit because the State willingly accepted white jurors with the same traits that supposedly rendered [a Black prospective juror] an unattractive juror." *Foster v. Chatman*, 578 U.S. 488, 505, 136 S. Ct. 1737, 195 L. Ed. 2d 1 (2016). The Court also noted that the prosecution's principal reasons for striking Black prospective jurors shifted over time, suggesting that those reasons may be pretextual. The Court stated:

"[I]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar non-black [panelist] who is permitted to serve, that is evidence tending to prove purposeful discrimination." [*Miller-El v. Dretke*,] 545 U.S. 231, 241[, 125 S. Ct. 2317, 162 L. Ed. 2d 196] (2005). With respect to [two particular prospective jurors], such evidence is compelling. But that is not all. There are also the shifting explanations, the misrepresentations of the record, and the persistent focus on race in the prosecution's file. Considering all of the circumstantial evidence that "bear[s] upon the issue of racial animosity," we are left with the firm conviction that the strikes of [the two particular prospective jurors] were "motivated in substantial part by discriminatory intent."

*Foster v. Chatman*, 578 U.S. at 512-13.

In *Foster v. Chatman, supra*, the U.S. Supreme Court was able to review the *Batson* challenge before it with the benefit of a record containing the prosecution's file, which was obtained through a series of public records requests. We do not have that benefit here in Jackson's case; instead, we must rely solely on the record made in the course of voir dire and the reasons for striking Black prospective jurors proffered by the State during the *Batson* hearing.

### (b) Voir Dire and Jackson's *Batson* Challenge

In the case before us, voir dire was conducted starting with a panel of 30 potential jurors. At various points, three potential jurors were struck for cause, and each time one was struck, they were replaced with another potential juror. Accordingly,

there were still 30 potential jurors after the panel was passed for cause. The State and the defense were each given eight peremptory challenges, leaving 14 persons—12 jurors and 2 alternate jurors. The peremptory challenges were exercised off the record, and our record does not indicate which side used its peremptory challenges on which potential jurors, except for what can be gleaned from the discussion and arguments during the *Batson* challenge.

Jackson raised a *Batson* challenge on the record, but outside the presence of the jury. Jackson argued that the State used its peremptory challenges to strike two of the three "African-American" jurors in the jury pool. The following colloquy was had:

[Defense counsel:] [In the jury pool today,] [t]hree [jurors] were African-American, and the State struck two of them in their peremptory strikes — Juror No. 1 [T.K.], Juror No. 11 [K.F.], and the only remaining African-American juror is Juror No. 24.

THE COURT: So they kept 33 percent of the African-Americans that were called?

[Defense counsel:] Correct, Judge.

THE COURT: Okay. Make your prima facie case.

[Defense counsel:] Your Honor, specifically regarding Juror No. 11, there was no information elicited from that juror to explain, I believe, her being struck.

THE COURT: Also, the Court will take judicial notice that . . . Jackson is a black, African-American. And [defense counsel] is correct — Juror No. 1 is a black female, Juror No. 11 was a black female, and Juror No. 24 was a black female. And the State did exercise their peremptory strikes on two of the black females — No. 1 and No. 11.

The Court's going to find that the defense has made a prima facie case for their *Batson* challenge.

Can [the State] please state your reasons why you struck Juror No. 1 and Juror No. 11, starting with Juror No. 1.

[The State:] Sure. Thank you, Judge. [Juror No. 1] indicated she . . . has a medical condition; she's diabetic. I can tell you that that has no bearing on the State using a peremptory strike for her. She has said that she disagreed — she has disagreed with physicians, historically, in the past. This is a medical and evidence — a medical-heavy case. I believe that that information is essential, that bears on the State's input. And she also indicated that she has some law school, and I tend to stay away from attorneys and people with legal experience in jury trials. So, the gender and race-neutral reasons for striking her is, number one, her medical condition. Number two, the fact that she has medical experience which she has expressed disagreements with physicians, historically. We have seven physicians who will be testifying. She has prior law school experience. We think that is more than sufficient grounds for a *Batson* race and gender-neutral reason for striking her.

THE COURT: All right. Number 11?

[The State:] . . . . As indicated when the Court inquired of her, [she] has no children. This involves an allegation involving a three-month old child. She has a high school degree — or high school. Again, this is a medical-heavy case. Some of the terminology — well, I'll tell you that she flat out said that she has an opinion about police officers; she does not trust police officers. And that, in and of itself, I think is sufficient grounds for the State to establish a race and gender-neutral reason for striking her. That, in addition to she has no children around, in addition to the fact that we are having seven expert witnesses testify to medical topics, I think is sufficient grounds for a peremptory strike.

THE COURT: Also, I want the record to reflect that I don't know — when you did ask that question about the police, [juror No. 11] did raise her hand, but I don't know if she was identified for the record, but I did note

in my notes that she was one of the jurors who raised her hand about suspicion of the police, to that question, as well as a couple other — several other jurors.

As to No. 1 — so I do find that the State has articulated a race-neutral reason for striking [name of juror No. 11], No. 1. Is there any argument from the defense?

[Defense counsel:] Yes, Your Honor. There were also other jurors that were not struck that were not married and do not have children. . . . Juror No. 9 . . . not married, no children. Number 6 . . . not married, no children.

THE COURT: But I've already found [juror No. 11] — they articulated a race-neutral.

I'm talking about [juror No. 1]. Her reasoning is that her medical condition as well as her profession, that she does work with physicians and she does disagree with them.

[Defense counsel:] Your Honor, she — there were other individuals — other jurors that also reported health issues that were not struck. There were other individuals that discussed disagreeing with doctors, getting second opinions; they were not struck. Further, she — her education was not in this country. There's no indication of whether — her knowledge of this legal system. That's all, Your Honor.

THE COURT: I find also the State has articulated a race-neutral reason as to why Juror No. 1 was stricken, so I'll deny the *Batson* motion.

### (c) Arguments on Appeal

Jackson's *Batson* challenge was based on the State's use of peremptory strikes to strike both juror No. 1 and juror No. 11, "two African American women," when "[t]here were only three African Americans originally in the venire." Brief for appellant at 13.

### (i) Juror No. 1

Jackson claims that "[w]ith respect to Juror No. 1, the State's reasons for striking her were facially race-neutral, however,

several of the reasons cited by the State in striking Juror No. 1 applied equally to other nonblack jurors who were permitted to serve on the jury." Brief for appellant at 13. "As such, the singling out of Juror No. 1 suggests purposeful discrimination, similar to *Foster*." Brief for appellant at 13. We would note that in *Foster v. Chatman*, 578 U.S. 488, 136 S. Ct. 1737, 195 L. Ed. 2d 1 (2016), there was also evidence of shifting explanations by the prosecution, misrepresentations of the record, and a persistent focus on race in the prosecution's file, none of which are present in the record currently before us. Therefore, in the present case, we are limited to reviewing the reasons proffered by the State and considering whether they were equally applied to other non-Black jurors who were permitted to serve on the jury.

When asked to give its reasons for striking juror No. 1, the State noted that juror No. 1 had "a medical condition" and that she was diabetic, but this had "no bearing on the State using a peremptory strike for her." Rather, the State indicated that juror No. 1 "has disagreed with physicians, historically, in the past" and that this was a "medical-heavy case." The State also noted that juror No. 1 had "some law school" and that the State tended "to stay away from attorneys and people with legal experience in jury trials." And although previously stating juror No. 1's medical condition had no bearing on the peremptory strike, the State proceeded to say that

> the gender and race-neutral reasons for striking her is, number one, her medical condition. Number two, the fact that she has medical experience which she has expressed disagreements with physicians, historically. We have seven physicians who will be testifying. She has prior law school experience. We think that is more than sufficient grounds for a *Batson* race and gender-neutral reason for striking her.

Jackson argues, however, that "the State did not strike several jurors who also had medical issues or had experienced differing opinions among doctors." Brief for appellant at 13.

Jackson points to juror No. 24, who indicated she had "lower back issues with a slipped disc." She confirmed that if she could stand, move around, and stretch, it would help her back. As noted above, the State said that juror No. 1's medical condition had "no bearing on the State using a peremptory strike for her," yet the State subsequently included her "medical condition" as a "number one" reason for striking her. At a minimum, the State's position related to juror No. 1's medical condition is confusing based on the statements made during the *Batson* hearing; however, the district court could have disregarded this reason as a basis for the striking of juror No. 1, since the State indicated juror No. 1's medical condition had no bearing on its use of a peremptory strike against her. The inclusion of juror No. 1's "medical condition" in the State's summation of reasons in support of striking juror No. 1 may have been viewed by the district court as an inadvertent reference in light of the earlier statement.

Regarding the other two reasons proffered by the State, we note the following information revealed by juror No. 1: She is a "nurse at the VA" where she works with patients "coming out of surgery," which work does not include children. She went to law school in Tunisia, came to the United States "four years ago," and then went to nursing school at "St. Mary's." Juror No. 1 has three children between the ages of 24 and 31, and her husband is a fire marshal. When asked if anyone was "skeptical or disagreed with the physicians' medical diagnosis," juror No. 1 responded, "[S]ometimes." When asked what she would do if she disagreed with doctors in reaching a diagnosis, she said she might "investigate a little bit more." However, she indicated that if a specialist, like an oncologist, gave an opinion "about radiology or a CT or an MRI scan," the specialist was "believable" because of training in that area.

As for the State's second reason for striking juror No. 1, it stated that she had "expressed disagreements with physicians, historically." Jackson points out that the State did not strike either juror No. 4, 6, or 7, "who all had experiences

involving misdiagnoses by doctors or had sought second opinions from doctors." Brief for appellant at 13. The record from voir dire reflects that juror No. 4's son had a misdiagnosed skin rash, so he "ended up going to a different doctor." Juror No. 6's brother had seen multiple doctors and none of them could diagnose the cause of his nerve pain, so he had to switch hospitals multiple times. Juror No. 7's daughter had "absence epileptic syndrome," and that juror's family sought out a different specialist because the family felt the doctor was not thorough enough, meaning not spending enough time reviewing records or "even understanding what the labs were saying." Juror No. 7 found the subsequent doctor's diligence to be "deeper." Juror No. 7 stated that "you have to be an advocate in the space and you have to make sure they are answering the questions you want and be informed."

One difference between jurors Nos. 4, 6, and 7, and juror No. 1 is that jurors Nos. 4, 6, and 7 all had family members who, as patients, experienced a misdiagnosis or sought second opinions for their medical conditions. Juror No. 1 was a nurse who, in her professional capacity, sometimes had a difference of opinion or disagreed with a doctor's diagnosis. Thus, the State's reason for striking juror No. 1, but keeping jurors Nos. 4, 6, and 7, was not entirely incongruous. However, we also bear in mind, that although juror No. 1 stated that if she disagreed with doctors in reaching a diagnosis, she might "investigate a little bit more," she nevertheless also indicated that if a specialist gave an opinion, she would find the specialist "believable." Juror No. 1's philosophy in this regard is not different from juror No. 7's, in that juror No. 7 also wanted a doctor's diligence in reviewing records and understanding laboratory results to be "deeper" and to "be informed" by making sure doctors answer questions.

As for the State's third reason for excluding juror No. 1, which was because of her law school experience, Jackson contends the State failed to question juror No. 1 about her prior law school experience. For example, the State did not follow

up with any questions about "how long ago" she attended law school, "how long she attended, whether she earned a degree, or whether the experience would have any bearing on her service as a juror." Brief for appellant at 14. Jackson contends that "[t]he State's avoidance of the topic belies its concern and professed motivation in striking Juror No. 1." *Id*. However, during the *Batson* challenge, the State said that it "tend[s] to stay away from attorneys and people with legal experience in jury trials." And juror No. 8, the only other juror that had professional legal training (a degree in paralegal studies), was also struck from the jury, although we do not know by whom.

Whether a defendant has shown purposeful discrimination "turns on factual determinations, and, 'in the absence of exceptional circumstances,' we defer to state court factual findings unless we conclude that they are clearly erroneous." *Foster v. Chatman*, 578 U.S. 488, 500, 136 S. Ct. 1737, 195 L. Ed. 2d 1 (2016). In this instance, the district court concluded that "the State has articulated a race-neutral reason as to why Juror No. 1 was stricken, so I'll deny the *Batson* motion." In so concluding, the district court had to necessarily evaluate the persuasiveness of the justification proffered by the prosecutor and determine whether the explanation was a pretext for discrimination. See *State v. Wofford*, 298 Neb. 412, 904 N.W.2d 649 (2017). The court's decision indicates it believed the reasons proffered by the State and found no pretext to the explanations provided. Once a trial court has decided the ultimate question of intentional discrimination, the question on appeal is only whether the prosecutor's reasons were facially race neutral and whether the trial court's final determination regarding purposeful discrimination was clearly erroneous. See *id*. A trial court's determination that the prosecutor's race-neutral explanation should be believed frequently involves its evaluation of a prosecutor's credibility, which requires deference to the court's findings absent exceptional circumstances. *Id*.

Jackson concedes that the State's reasons for striking juror No. 1 were facially race neutral, but suggests those reasons

were pretextual. In considering whether the district court clearly erred in finding that the prosecutor's race-neutral explanation for the peremptory strike was genuine and not pretextual, we may consider the rationality of the prosecutor's reason in our inquiry. See *id*. A prosecutor's intuitive assumptions, inarticulable factors, or even hunches can be proper bases for rejecting a potential juror, so long as the reasons are not based on impermissible group bias. *Id*.

Although there were some similarities between juror No. 1 and other jurors who were not struck, such as having a medical condition that might require a recess during the proceedings or not always being satisfied with a doctor's assessment or diagnosis, there were other reasons articulated that the district court could have found credible and not pretextual. In particular, it is reasonable for attorneys to strike jurors who have law degrees or other legal training.

Based on our review of the record, we conclude the district court did not clearly err when it found that the prosecutor's race-neutral explanation for striking juror No. 1 was valid and that the use of the peremptory challenge was not purposefully discriminatory. Accordingly, Jackson did not meet his burden of proving purposeful discrimination by the State in striking juror No. 1.

### (ii) Juror No. 11

Jackson once again claims that several of the reasons cited by the State in striking juror No. 11 applied "equally to other nonblack jurors that the State did not strike." Brief for appellant at 14-15. "Accordingly, the disparate treatment of Juror 11 . . . raises an inference of purposeful discrimination." *Id.* at 15. Jackson also argues that the State's failure to question juror No. 11 on the topics it identified shows that striking juror No. 11 was "nothing more than a sham and a pretext for discrimination." *Id.*

As noted by Jackson, "[t]he record contains no specific mentions of Juror No. 11 [during voir dire] except for her initial

responses to the court's general questions of every venire-person — her marital, employment, and educational background." *Id.* at 15.

During the *Batson* challenge, the State gave three reasons for striking juror No. 11: (1) She had a high school education, (2) she had no children, and (3) she did not trust police officers. Whether a prosecutor's reasons for using peremptory challenges are race neutral is a question of law. *State v. Briggs*, 303 Neb. 352, 929 N.W.2d 65 (2019).

Jackson does not challenge whether the State's proffered reasons for striking juror No. 11 were facially race neutral. Rather, Jackson contends the State's proffered reasons could have been equally applied to other non-Black jurors who the State did not strike, thus raising an inference of purposeful discrimination. We therefore limit our review accordingly.

When evaluating whether there has been purposeful discrimination, the trial court evaluates the persuasiveness of the justification proffered by the prosecutor, and it ultimately determines whether the explanation was a pretext for discrimination. See *State v. Wofford*, 298 Neb. 412, 904 N.W.2d 649 (2017). A trial court's determination that the prosecutor's race-neutral explanation should be believed frequently involves its evaluation of a prosecutor's credibility, which requires deference to the court's findings absent exceptional circumstances. *Id*.

Jackson points out that the State did not strike juror No. 5, who also had a high school education, or juror No. 6, who also did not have children. Jurors Nos. 5 and 6 each had one of the State's cited reasons in common with juror No. 11. However, although juror No. 5 had a high school education, she also had children; the State noted that the allegation against Jackson involved a 3-month-old child. And although juror No. 6 did not have children, she had a college degree. In fact, of the 14 jurors that remained after each side exercised its peremptory strikes, 13 had college degrees. During the *Batson* challenge, the State noted that this was a "medical-heavy case" and that seven expert witnesses would be testifying.

Jackson also points out, "Despite the State's representation that Juror No. 11 'flat out said that she has an opinion about police officers; she does not trust police officers,' this assertion is not born out by the record." Brief for appellant at 15. Further, "[T]he State did not follow up with any questions directed at Juror No. 11 to elaborate on why she indicated a suspicion of police and whether that opinion would impact her ability to serve as a juror." *Id.* Thus, "The State's assertion of this basis for striking Juror No. 11 is nothing more than a sham and a pretext for discrimination . . . ." *Id.*

During voir dire, the State asked who had a strong opinion, favorable or unfavorable, about law enforcement. Juror No. 6 stated that her father was a retired police officer and that she had a favorable opinion of law enforcement. The State then asked who was distrustful of police; it noted that "[t]here's a room full of people and only, like, three people raised their hand." No identification of which jurors raised their hands was made on the record. We point out here that it is very difficult to review *Batson* challenges when the record does not reveal which jurors raised their hands in response to a question that may later serve as a basis for striking a juror. The State continued to ask who had an opinion about police that might potentially affect their ability to listen to what was said, but apparently received no response from the jury pool. The State later asked again who was distrustful of the police, and again "hands . . . were raised"; no jurors were specifically identified once again. The State then asked, "Of those hands that were raised, are any of you distrustful to the point that you are not going to listen to an officer's information and testimony with an open mind?" Juror No. 18 was the only one specifically identified on the record at that time. The State said, "The reason that I'm calling on you, [juror No. 18], is you raised your hand and I didn't see a head nod one way or the other, so I'm not sure and I want to be fair to you and I want to make sure I know." The State further said, "Tell me what you think," "are your feelings so strong that you are

going to not listen to what they say?" Juror No. 18 stated that he would listen and keep an open mind. No other prospective juror was identified or questioned at that time.

However, during the *Batson* challenge, the court stated it wanted "the record to reflect" that juror No. 11 "was one of the jurors who raised her hand about suspicion of the police, to that question." However, the record does not reveal whether juror No. 11 raised her hand in response to only the first inquiry about distrusting the police, when it was noted that three people raised their hands, or whether she may have also raised her hand in response to the later inquiry, when the State asked people whose "hands . . . were raised" whether they were "distrustful to the point" that they would not listen to "an officer's information and testimony with an open mind." Because only juror No. 18 was questioned after the latter inquiry, it is reasonable to conclude that no other juror raised his or her hand in response to that second inquiry. Therefore, while juror No. 11 was identified by the court as raising her hand in response to the question about suspicion of police, there is nothing to indicate she raised her hand to the followup question on whether she was so distrustful that she would not listen to an officer's testimony with an open mind. However, juror No. 18, whose raised hand indicated he distrusted police, also specifically stated that he would listen and keep an open mind. Nevertheless, he was struck from the jury, although we do not know by whom.

The reasons the State gave for striking juror No. 11, besides her distrust of police officers, were that she had a high school education and had no children. This was also true for juror No. 18, who was also struck. Of the 30 potential jurors remaining after the panel was passed for cause, jurors Nos. 11 and 18 were the only two jurors who had no children and who did not report having at least some education beyond high school. As previously noted, of the 14 jurors that remained after each side exercised its peremptory strikes, 13 had college degrees, and the one who did not, had children. Contrary to

Jackson's assertion, the State's reasons for striking juror No. 11 did not apply equally to other non-Black jurors who were permitted to serve on the jury. Jackson did not meet his burden of proving purposeful discrimination by the State in striking juror No. 11.

### (iii) Summary

Jackson's claim under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), fails because the prosecutor's reasons for striking jurors Nos. 1 and 11 were facially race neutral, and giving deference to the district court's consideration of the prosecutor's credibility, we cannot say that its determination that there was no purposeful discrimination was clearly erroneous.

### 2. Sentence

Jackson was convicted of one count of child abuse resulting in serious bodily injury, a Class II felony, pursuant to § 28-707(7). The Class II felony was punishable by 1 to 50 years' imprisonment. See Neb. Rev. Stat. § 28-105 (Reissue 2016). Jackson was sentenced to 14 to 18 years' imprisonment, with credit for 538 days already served; his sentence was within the statutory range.

When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the violence involved in the commission of the crime. *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020). The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.*

Jackson was 29 years old at the time of sentencing. According to the presentence report, Jackson was single and had one child, a sibling of the victim in this case. He reported

being expelled from high school, but he earned his high school diploma while in prison in 2013. According to Jackson, he had recently worked for his adoptive father's construction company.

Jackson reported that when he was a child, he and his two biological brothers were removed from their mother's home because of her drug use. They were placed in several foster homes, where Jackson experienced abuse and was molested. Jackson and his brothers were subsequently adopted. He claims that his adoptive parents did not treat him and his brothers the same as their own daughters and that he received "severe punishments and belt-whippings." According to Jackson, his adoptive family was not poor, "but he lived a life of neglect and poverty by his adoptive parents' choice." He acknowledged that he experienced serious behavior problems as a child and frequently ran away from home.

Jackson's prior adult criminal history includes: "Obstruct Administration of Law" and theft by unlawful taking in 2009 (30 days in jail for each count); leaving the scene of a property damage accident in 2010 (15 days in jail); shoplifting and failure to appear in 2010 (2 days in jail on each count); theft by unlawful taking in 2010 (20 days in jail); third degree domestic assault in 2010 (180 days in jail); possession of methamphetamine in 2010 (placed in drug court, but later withdrew and was sentenced to 90 days in jail); unauthorized use of a motor vehicle (3 months in jail), theft by unlawful taking (6 months in jail), unauthorized use of a financial transaction device (6 months in jail), and criminal possession of a financial transaction device (3 months in jail) in 2010; third degree domestic assault in 2011 (180 days in jail); burglary in 2011 (2 to 4 years' imprisonment, but parole revoked in 2013); false information in 2014 (2 days in jail); theft by unlawful taking, over $1,500, in 2014 (270 days in jail); receiving unlawfully taken property in 2014 (60 days in jail); "Theft Shoplifting" in 2014 (30 days in jail); theft by unlawful taking in 2014 (90 days in jail); felony escape in 2014

(1 year in prison); terroristic threats in 2015 (1 year in prison); "Theft Shoplifting" in 2016 (120 days in jail); "Obstruct Administration of Law" in 2016 (20 days in jail); "Theft Shoplifting" in 2017 (1 year in prison and 12 months' "PRS"); "PRS" revoked in 2018 (90 days in jail); and theft by unlawful taking in 2018 (120 days in jail). Jackson also served jail time for numerous other counts of failing to appear, driving under suspension, no proof of ownership or insurance, and no valid registration. During periods of confinement, Jackson incurred "lockdowns" for numerous incidents. He has a diagnosis of antisocial personality disorder.

The presentence report contains a victim impact statement from a Nebraska Department of Health and Human Services case coordinator and the victim's mother. The case coordinator reported that the victim, now 21 months old, "is strong but will be forever changed" due to Jackson's actions. The victim's "[d]iagnosis due to incident [includes]: traumatic brain injury, epilepsy, symbolic dysfunctions, dysphagia, generalized weakness, cerebral palsy, sleep disorder, [and] obstructive sleep apnea." The projected yearly costs are $105,699 for the victim's "outpatient, pharmacy, inpatient, [and] professional services, [and] surgeries." The victim's mother reported that the case has "affected my family alot [sic]." The mother also stated that the victim has "[r]ight [h]emiplegic cerebral palsy" and does not walk.

The probation officer conducted a "Level of Service/Case Management Inventory." Jackson was assessed as a "very high risk" to reoffend. He scored "very high risk" in the criminogenic risk factor domains for family/marital, companions, procriminal attitude/orientation, and antisocial pattern. He scored "high risk" in the domains for criminal history, education/employment, leisure/recreation, and alcohol/drug problem. The probation officer recommended that Jackson be sentenced to a term of incarceration.

At the sentencing hearing, Jackson's counsel stated that in the presentence report there was "significant information

regarding . . . Jackson's childhood and his upbringing demonstrated a significant amount of disfunction [sic] in his background." Jackson "was the product of trauma and neglect from a very young age at the hand of multiple adults." Counsel asked the district court to consider giving Jackson "a broad range of a sentence" because it would give him an "incentive to work towards programming in a correctional facility." Counsel stated that "if there's a minimum of two or three years," Jackson would be eligible for programming, and "[a] higher number on the top with a wide range will not only give him that incentive but also will give him the benefit of supervision for an extended period of time."

The State said that it could "appreciate the upbringing" Jackson had and that it understood what trauma could do to someone, but "it does not excuse the fact that he now inflicted trauma on a baby," who "has a significant amount of brain loss" and will never be "fully functioning." The State said that child "will never be able to walk [or] talk" and that she "is forever going to have lifelong effects, whether there's cerebral palsy, learning disabilities, but those are going to be some prolonged and profound effects." According to the State, Jackson, "as young as he is," "has a very long-standing criminal history, a very violent history," and "[t]here's quite a bit of domestic abuse." The State asked the district court to incarcerate Jackson, but submitted the length of the incarceration to the court's discretion. However, the State asserted that "something as low as two to three years is, honestly, offensive given the nature and the gravity of the crime."

The district court noted that it had received three letters from Jackson and his family members that it was making part of the presentence report. The court stated that although Jackson claimed he did not do anything, it was going to sentence him based on the finding of the jury that he was guilty beyond a reasonable doubt of intentional child abuse resulting in serious bodily injury. The court said it understood Jackson's upbringing, but noted that he had been in trouble with the

law on multiple occasions going back to 2009, when he was a juvenile. The court said it "[could not] overlook the facts of this case" or "[Jackson's] criminal history." The court sentenced Jackson as set forth previously.

In his brief on appeal, Jackson contends that his sentence was excessive and an abuse of discretion because the district court failed to adequately consider the mitigating factors. He claims the court failed to adequately consider his age, education and experience, mentality, and the circumstances of the offense when it imposed sentence, and he further claims that had the court properly considered the mitigating factors, his sentence "would have been substantially shorter." Brief for appellant at 23. Jackson then recounts his "tumultuous childhood," *id.*, and the facts that he completed high school while incarcerated, worked for his adoptive father, has a great relationship with his daughter, and has a "support system" following release, *id.* at 24. He also recounts that he "reacted immediately when he saw [the victim] needed help and was the first to rush paramedics to her presence at the scene." *Id.* Jackson also maintains his innocence.

Having considered the relevant factors in this case, we find that Jackson's sentence was not excessive or an abuse of discretion, and his sentence is therefore affirmed. See *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020) (sentence imposed within statutory limits will not be disturbed on appeal absent abuse of discretion by trial court).

## VI. CONCLUSION

For the reasons stated above, we affirm the district court's decision denying Jackson's *Batson* challenge. We also affirm Jackson's conviction and sentence.

AFFIRMED.